151 T.C. No. 14

UNITED STATES TAX COURT

PINE MOUNTAIN PRESERVE, LLLP f.k.a. CHELSEA PRESERVE, LLLP,
EDDLEMAN PROPERTIES, LLC, TAX MATTERS PARTNER,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8956-13.                          Filed December 27, 2018.

       P acquired a tract of land near Birmingham, Alabama, and conveyed to a qualified land trust, in 2005, 2006, and 2007, easements covering relatively small portions of that property. Each easement defined a conservation area that was to be restricted in perpetuity from commercial and residential development, with a carve-out in the 2005 and 2006 easements for 16 reserved "building areas," within each of which P could construct a single-family residence. The 2006 easement did not specify the location of the building areas, and the 2005 easement permitted P (with the trust's consent) to move the building areas from their initially designated locations to any other location within the conservation area. The 2005 easement also reserved to P the rights to construct, within the conservation area, other facilities appurtenant to residential development, such as barns, riding stables, scenic overlooks, and boat storage buildings, some of which could include additional living quarters.

P claimed charitable contribution deductions for the easements on its 2005, 2006, and 2007 tax returns. R contends that the easements were not "qualified real property interest[s]" under I.R.C. sec. 170(h)(1)(A); that the easements were not made "exclusively for conservation purposes" under I.R.C. sec. 170(h)(1)(C); and that P overstated the fair market values of the easements.

1. Held: The 2005 and 2006 easements did not restrict a specific, identifiable piece of real property because they allowed supposedly conserved land to be taken back and used for residential development. Because neither easement constituted "a restriction (granted in perpetuity) on the use which may be made of the real property," I.R.C. sec. 170(h)(2)(C), neither easement constituted a "qualified real property interest" that could give rise to a charitable contribution deduction under I.R.C. sec. 170(h)(1)(A). Belk v. Commissioner, 774 F.3d 221 (4th Cir. 2014), aff'g 140 T.C. 1 (2013), followed.

2. Held, further, the 2007 easement covered a specific, identifiable piece of real property and was "granted in perpetuity" under I.R.C. sec. 170(h)(2)(C).

3. Held, further, the 2007 easement was made "exclusively for conservation purposes" under I.R.C. sec. 170(h)(1)(C).

4. Held, further, the inclusion in the 2007 easement of a provision allowing amendments, provided that they were "not inconsistent with the conservation purposes of the donation," did not prevent that easement from satisfying the granted-in-perpetuity requirement of I.R.C. sec. 170(h)(2)(C).

David M. Wooldridge, Ronald Levitt, Gregory P. Rhodes, and Michelle A. Levin, for petitioner.

Edwin B. Cleverdon and Horace Crump, for respondent.

LAUBER, Judge:  For the calendar taxable years 2005, 2006, and 2007, the Internal Revenue Service (IRS or respondent) issued notices of final partnership administrative adjustment (FPAAs) to Pine Mountain Preserve, LLLP.  These notices disallowed charitable contribution deductions claimed by the partnership in the following amounts for donations of conservation easements:

| Year | Deduction |
|------|-----------|
| 2005 | $16,550,000 |
| 2006 | 12,726,000 |
| 2007 | 4,100,000 |

Eddleman Properties, LLC (Eddleman Properties), the partnership's tax matters partner, filed a timely petition for readjustment of partnership items.  See sec. 6226(a).[1]  We have jurisdiction under section 6226(f).

FINDINGS OF FACT

The Court adopts the stipulations of fact executed by the parties.  When the petition was filed, the partnership had its principal place of business in Alabama.

---

[1]All statutory references are to the Internal Revenue Code of 1986 (Code), as in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

A.      Assembly of the Pine Mountain Property

Beginning in 2004 Douglas Eddleman and his father (together Eddlemans) began acquiring tracts of land in Shelby County, Alabama, about 20 miles southeast of Birmingham.  As we describe in greater detail below, the Eddlemans or entities they controlled eventually purchased 10 contiguous parcels covering 6,224 acres.  We will refer to these parcels collectively as the Pine Mountain property.  The map infra p. 5 shows the Pine Mountain property, the boundaries of the 10 parcels included within it, and the boundaries of the three easements eventually placed on the property.[2]

The Pine Mountain property is situated north of the Highway 280 corridor, which stretches from Birmingham to Harpersville in Shelby County.  The Highway 280 corridor is the most affluent part of the Birmingham metropolitan area.  Douglas Eddleman believed that development of the Pine Mountain property would require points of access to Highway 280 and to Old Highway 280, which runs roughly parallel to Highway 280 to the north.

------

[2]A table on this map incorrectly sums the "total purchased areas" as 6,214 rather than 6,224 acres.  The "purchase legend" incorrectly shows the dates of purchase for a number of parcels.  The findings of fact rely on the parties' joint stipulation of facts and not the dates in the legend.



When the Eddlemans began assembling the Pine Mountain property, it consisted of unincorporated land between the city of Chelsea to the west and the town of Westover to the east. As of 2001 this area was completely unimproved. In May 2004 Eddleman Properties formed Chelsea Preserve, LLLP, a Delaware limited partnership, to hold the Pine Mountain property. This partnership also did business as Pine Mountain Preserve, LLLP, and we will refer to it as Pine Mountain.

On February 19, 2004, Eddleman Properties signed a contract to purchase 18.76 acres of land (Parcel 1). Parcel 1 borders on Old Highway 280. On May 14, 2004, Eddleman Properties closed on this contract and purchased Parcel l for $225,120. It conveyed Parcel 1 to Pine Mountain in December 2004.

On March 23, 2004, Eddleman Properties acquired for $50,000 options to purchase approximately 4,180 acres of forest land known as the Cahaba Forests property. This property consisted of four contiguous parcels (Parcels 2, 5, 6, and 7). These parcels lacked access to Highway 280 and Old Highway 280. But if Eddleman Properties were to exercise its options, Parcel 1 (which bordered Parcel 5) would provide a link between Old Highway 280 and the Cahaba Forests property. Eddleman Properties subsequently transferred each of the options to Pine Mountain; the record is silent on the nature or timing of these transfers.

On June 2, 2004, Pine Mountain acquired Parcel 2, consisting of 1,189.90 acres of the Cahaba Forests property, for $5,354,550. It did so by exercising one of the options referenced above.

On July 23, 2004, Pine Mountain purchased Parcel 3, consisting of 7.53 acres, for $250,000. On October 28, 2004, Pine Mountain purchased Parcel 4, consisting of 26.55 acres, for $1,460,250. Together, Parcels 3 and 4 provided a point of access from the Cahaba Forests property to Highway 280 and a second point of access to Old Highway 280.

During 2004 and continuing into 2005, Pine Mountain negotiated with the mayors of Westover and Chelsea to determine which of the two municipalities might annex the Pine Mountain property and on what terms. Pine Mountain concluded that Westover offered better tax incentives. By early 2005 Pine Mountain and representatives of Westover had sketched out the basic terms under which Westover might annex the Pine Mountain property.

On January 14, 2005, Pine Mountain acquired Parcel 5, consisting of 365.01 acres of the Cahaba Forests property, for $1,642,545. It did so by exercising one of the options Eddleman Properties had acquired via the March 2004 contract referenced above. Parcel 5 bordered Parcels 1 and 2.

On August 8, 2005, Pine Mountain made an offering permitting investors to buy interests in the partnership, which then owned about 1,600 acres of land (Parcels 1, 2, 3, 4, and 5) and had options to buy another 2,600 acres (Parcels 6 and 7). Investors ultimately acquired 300 limited partnership units, which entitled them to 50% of the partnership's profits, losses, and cashflows. The limited partners paid $29,970,000 for their interests. Eddleman Properties retained a general partnership interest entitling it to 50% of the partnership's profits, losses, and cashflows.

On November 10, 2005, Pine Mountain acquired Parcel 6, consisting of 1,273.21 acres of the Cahaba Forests property, for $6,366,050. It did so by exercising one of the options Eddleman Properties had acquired via the March 2004 contract referenced above. Parcel 6 bordered Parcels 2 and 5.

On December 27, 2005, Pine Mountain conveyed to the North American Land Trust (NALT), a "qualified organization" for purposes of section 170(h)(3), the first of the conservation easements at issue (2005 easement). At that time Pine Mountain owned Parcels 1, 2, 3, 4, 5, and 6, covering 2,881 acres. The 2005 easement affected only Parcel 2. It covered mostly contiguous land in the northern half of Parcel 2, consisting of 559.48 acres in total. This acreage includes ridgeline areas and lower-lying land surrounding a large man-made lake. The terms of the 2005 easement are described more fully below. See infra pp. 12-18.

On September 20, 2006, Pine Mountain signed an agreement with the town of Westover under which the town would eventually annex the entirety of the Pine Mountain property. The annexation process began on November 6, 2006, and proceeded in stages through the next four months. At no point did Pine Mountain discuss with Westover the placement of conservation easements over any part of the Pine Mountain property.

On October 11, 2006, Pine Mountain acquired Parcel 7, consisting of 1,352.72 acres of the Cahaba Forests property, for $7,439,960. It did so by exercising one of the options Eddleman Properties had acquired via the March 2004 contract referenced above. Parcel 7 bordered Parcel 6 on the west and Parcel 5 on the south.

On the same day Pine Mountain acquired Parcel 8, consisting of 794.64 acres east of Parcel 7, for $5,721,408. It did so by exercising one of the options Eddleman Properties had acquired, in June 2006, to purchase Parcels 8, 9, and 10.

On December 1, 2006, Pine Mountain made an offering to its limited partners whereby each owner of a limited-partnership unit had the opportunity to buy an additional half unit for $49,950. Pursuant to this offering, investors ultimately paid $14,985,000 for 300 half units. Following completion of this offering, the limited partners continued to share 50% of the profits, losses, and cashflows of

Pine Mountain, and Eddleman Properties continued to own a general partnership interest entitling it to 50% of the profits, losses, and cashflows.

On December 12, 2006, Pine Mountain submitted to the town of Westover an application to rezone the Pine Mountain property from "agricultural preserve" to "planned unit development" (PUD). At that point, Westover had not yet annexed the Pine Mountain property; under the Westover zoning ordinances, property annexed into the town is initially zoned as "agricultural preserve." On December 22, 2006, the Shelby County Department of Development Services responded to Pine Mountain's rezoning application, stating that more detailed information would be needed to support rezoning.

On December 20, 2006, Pine Mountain conveyed to NALT, and recorded the next day, the second of the conservation easements at issue (2006 easement). At that time Pine Mountain owned Parcels 1, 2, 3, 4, 5, 6, 7, and 8, covering 5,028 acres. The 2006 easement covers ridgeline areas of Parcel 6 and noncontiguous lower lying areas of Parcels 2 and 5, consisting of 499.23 acres in the aggregate. The terms of the 2006 easement are described more fully below. See infra pp. 18-21.

On January 31, 2007, Pine Mountain acquired Parcel 9, consisting of 676 acres located between Parcels 7 and 8, for $4,867,200. Pine Mountain completed

its assembly of the Pine Mountain property on October 1, 2007, when it acquired Parcel 10, consisting of 519.91 acres located between Parcels 7 and 9, for $3,743,352. It purchased both properties by exercising options Eddleman Properties had acquired in June 2006.

In early 2007 Pine Mountain supplemented its rezoning application. On March 19, 2007, the town of Westover completed its annexation of the Pine Mountain property. One week later the Shelby County Department of Development Services issued a report to Westover concerning the rezoning application. It advised that the Pine Mountain property upon annexation would automatically be zoned as "agricultural preserve" and that Westover should then consider the proper zoning classification. On April 23, 2007, Westover enacted an ordinance that rezoned the Pine Mountain property from agricultural preserve to PUD.

On December 19, 2007, Pine Mountain conveyed to NALT, and recorded two days later, the third of the conservation easements at issue (2007 easement). Pine Mountain then owned all ten parcels, consisting of 6,224 acres. The 2007 easement covers ridgeline areas of Parcels 6 and 7 and noncontiguous lower lying areas of Parcels 5 and 7, consisting of 240.24 acres in the aggregate. The terms of the 2007 easement are described more fully below. See infra pp. 21-23.

The table below summarizes Pine Mountain's acquisition of the Pine Mountain property:

| Parcel | Acreage | Acquisition Cost (excluding options) |
|---|---|---|
| 1 | 18.76 | $225,120 |
| 2 | 1,189.90 | 5,354,550 |
| 3 | 7.53 | 250,000 |
| 4 | 26.55 | 1,460,250 |
| 5 | 365.01 | 1,642,545 |
| 6 | 1,273.21 | 6,366,050 |
| 7 | 1,352.72 | 7,439,960 |
| 8 | 794.64 | 5,721,408 |
| 9 | 676.00 | 4,867,200 |
| 10 | 519.91 | 3,743,352 |
| Total | 6,224.23 | 37,070,435 |

B.     Terms of the Easements

1.     The 2005 Easement

The terms of the 2005 easement are set forth in a Conservation Easement and Declaration of Restrictions and Covenants executed by Pine Mountain and NALT on December 27, 2005.  The easement covers 559.48 acres of Parcel 2 (2005 Conservation Area), constituting 47% of that parcel's total acreage.  Most of the 2005 Conservation Area consists of ridgelines and higher elevation land in the northwest portion of Parcel 2.  The balance consists of lower lying land around

a man-made lake near the center of Parcel 2. All land not covered by the easement remained available for residential or commercial development by Pine Mountain.

The easement states as its "conservation purposes" the preservation of the 2005 Conservation Area "as a relatively natural habitat of fish, wildlife, or plants" and "as open space which provides scenic enjoyment to the general public and yields a significant public benefit." In particular, the conservation values sought to be protected include the integrity of three natural communities of trees; riparian areas that drain into the Coosa River watershed; habitats for named species of plants and birds; and "a scenic woodland view from US Highway 280." To that end, article 2 of the easement prohibits residential, commercial, and industrial development of the 2005 Conservation Area while permitting recreational and agricultural activity (including breeding livestock and growing crops).

As an exception to the restrictions set forth above, article 3 of the easement, captioned "Reserved Rights," reserves to Pine Mountain and its successors (including individual homeowners) numerous rights. Article 3.1 provides that Pine Mountain or an individual homeowner may construct one single-family dwelling within each of ten "Building Areas" inside the 2005 Conservation Area, as shown in exhibit C appended to the easement. Each Building Area may include, besides a dwelling, "a shed, garage, gazebo, vehicle parking area, and pool."

Although the easement itself does not limit the size or location of these ten Building Areas, exhibit C shows each Building Area as a one-acre lot situated around a man-made lake. Article 3.16, however, provides that the "boundaries of the Building Areas may be modified by mutual agreement" of Pine Mountain and NALT. Such modification is subject to the proviso that "the areas of a Building Area shall not be increased" and that the boundary modifications shall not, in NALT's "reasonable judgment," adversely affect conservation purposes. Article 3.16 would thus permit the Building Areas to be relocated (with NALT's consent) to higher elevation zones or other locations within the 2005 Conservation Area.

Article 3.24 provides that Pine Mountain "may subdivide the Conservation Area into one or more lots, tracts or parcels under separate ownership," subject to NALT's approval, "which approval shall not be unreasonably withheld." Article 3 reserves to NALT and future owners of residences within the 2005 Conservation Area numerous additional rights, which constitute further exceptions to the restrictions set forth in article 2. These rights permit the following activities within the 2005 Conservation Area:

• Pine Mountain or homeowners may construct within the 2005 Conservation Area, within 1,000 feet of each Building Area, a barn that may occupy up to "5,000 square feet of ground coverage." Each barn is intended for livestock and

agricultural use but may also contain "an apartment for occupancy by a caretaker and such caretaker's family." NALT must approve in advance the location of each barn.

• Pine Mountain or homeowners may construct within the 2005 Conservation Area "one barn, riding stable and indoor riding ring." Up to ten acres of "land disturbed and trees cleared" may be consumed in the aggregate "for the barn, riding stable, and indoor riding ring." NALT must approve in advance the location of these buildings.[3]

• Pine Mountain or homeowners may construct within the 2005 Conservation Area two "scenic overlooks." One scenic overlook "may include a guest bedroom," and the other "shall be similar to a picnic pavilion or gazebo." Up to three acres may be cleared for each scenic overlook, and additional trees may be demolished to create "a viewing corridor for each scenic overlook structure." NALT must approve in advance plans for each scenic overlook structure.

• Pine Mountain or homeowners may construct and use roads and driveways "over and across the Conservation Area for access to the Building Areas, or

---

[3]It is not entirely clear whether article 3.2 permits only one riding stable and indoor riding ring within the 2005 Conservation Area or whether it permits one riding stable and indoor riding ring for each Building Area (for a total of ten). It is also unclear whether the barn mentioned in conjunction with the riding stable is in addition to the ten 5,000-square-foot barns permitted elsewhere in article 3.2.

other permitted structures." Pine Mountain or homeowners may construct "service vehicle trails" to facilitate access to parts of the 2005 Conservation Area "otherwise inaccessible by vehicle." Pine Mountain or homeowners may construct trails and paths across the 2005 Conservation Area for "outdoor recreation purposes." And they may construct "raised walkways for access to any or all of the land within the Conservation Area" for the convenience of homeowners and their guests. NALT must approve such construction in advance.

• Pine Mountain or homeowners may construct within the 2005 Conservation Area up to five ponds, each of which may occupy up to five acres. NALT must approve the location of these ponds. But its approval "shall not be unreasonably withheld."

• Pine Mountain or homeowners may construct within the 2005 Conservation Area up to 14 piers and boat launches. These structures may include "one pier for each of the ten Building Areas," plus four "common boat launch facilities with associated boat storage building[s]." The easement does not specify the location of these structures, e.g., whether they may be built on the man-made lake, the five ponds, and/or other bodies of water within the 2005 Conservation Area. No approval or prior review by NALT is required before construction of these facilities.

• Pine Mountain and homeowners may engage within the 2005 Conservation Area in "the breeding and release of deer, quail, duck, turkey, or other game animals." The easement guarantees the rights of homeowners and their guests "to hunt, trap, and otherwise harvest fish and wildlife" within the 2005 Conservation Area. On the other hand, article 6.4 provides that "[n]othing in this Conservation Easement shall be construed to create any right of access to the Conservation Area by the public."

• To facilitate hunting and shooting by homeowners and their guests, Pine Mountain or homeowners "may construct a reasonable number of wildlife hunting or observation stands and 'blinds.'" Apart from requiring that the number be "reasonable," the easement places no limit on the number of such hunting blinds, their location within the 2005 Conservation Area, or the total acreage they may occupy. No approval or prior review by NALT is required before construction of these facilities.

• Pine Mountain or homeowners may "drill and maintain a well or wells with necessary appurtenances outside of a Building Area, and withdraw water from the Conservation Area," for service to any buildings permitted under the easement (including residences, boat storage buildings, scenic overlooks, riding stables, and barns). Pine Mountain or homeowners may likewise "use the Conser-

vation Area for the underground disposal of waste water for service to a residential or other permitted use." No approval or prior review by NALT is required before construction of these facilities.

Article 6.7 of the easement provides that Pine Mountain, its successors in interest, and NALT "shall mutually have the right, in their sole discretion, to agree to amendments to this Conservation Easement which are not inconsistent with the Conservation Purposes." This provision reflects the recognition by Pine Mountain and NALT "that circumstances could arise which could justify the modification of certain of the restrictions contained in this Conservation Easement." However, NALT "shall have no right or power to agree to any amendments * * * that would result in this Conservation Easement failing to qualify * * * as a qualified conservation contribution under section 170(h) of the Internal Revenue Code and applicable regulations."

2.    The 2006 Easement

The terms of the 2006 easement are set forth in a Conservation Easement and Declaration of Restrictions and Covenants executed by Pine Mountain and NALT on December 20, 2006. The easement covers 499.23 acres, consisting of seven noncontiguous plots within Parcels 2, 5, and 6 (2006 Conservation Area). The conserved land, representing 17.6% of the total acreage of the three parcels,

comprises higher elevation territory in the northern half of Parcel 6 and lower-lying land in the southern portions of Parcels 2 and 5.

The 2006 easement recites the same conservation purposes and conservation values as the 2005 easement, plus one additional purpose:  preservation of the 2006 Conservation Area "as open space that will advance a clearly delineated Federal, State, or local government conservation policy."  Article 2 of the 2006 easement prohibits residential, commercial, and industrial development of the 2006 Conservation Area while permitting recreational and agricultural activity. And article 3 of the 2006 easement reserves to Pine Mountain and its successors (including individual homeowners), as exceptions to the restrictions set forth in article 2, numerous "Reserved Rights."

The "Reserved Rights" in the 2006 easement resemble those in the 2005 easement, with a few notable differences:

• Article 3.1 provides that Pine Mountain may establish within the 2006 Conservation Area six Building Areas, each as large as one acre.  Each Building Area may include a single-family dwelling plus "a shed, garage, gazebo, and pool," and the owner of each Building Area may construct a 5,000-square-foot barn within 1,000 feet of its perimeter.  However, the 2006 easement does not specify the location of the six Building Areas.  And it places no limitations on where

within the 2006 Conservation Area such Building Areas may be located, except to state that these locations must be "approved in advance" by NALT. NALT may withhold approval if it believes that the Building Area sites proposed by Pine Mountain would "result in any material adverse effect on any of the Conservation Values or Conservation Purposes."

• Article 3.2 provides that Pine Mountain may construct a water tower within the 2006 Conservation Area "for the use of the provider of water to surrounding property * * * and underground pipelines from such Water Tower to the areas served by the Water Tower within the Property." The "Property" is defined as the 2,828 acres constituting Parcels 2, 5, and 6. The 2006 easement thus permits Pine Mountain to construct pipelines across the 2006 Conservation Area to serve the six Building Areas and appurtenant structures permitted by the 2006 easement, the ten Building Areas and appurtenant structures permitted by the 2005 easement, and any residential or commercial development constructed by Pine Mountain on other portions of Parcels 2, 5, and 6. NALT had to approve in advance the design and location of the water tower and pipelines.

The 2006 easement includes an amendment provision identical to that in the 2005 easement. Unlike the 2005 easement, however, the 2006 easement does not include among Pine Mountain's "reserved rights" the rights to construct within the

2006 Conservation Area any scenic overlooks, riding stables, ponds, boat storage buildings, or piers.

3.  The 2007 Easement

The terms of the 2007 easement are set forth in a Conservation Easement and Declaration of Restrictions and Covenants executed by Pine Mountain and NALT on December 19, 2007. The easement covers 224.55 acres, consisting of seven noncontiguous plots within Parcels 5, 6, and 7 (2007 Conservation Area). The conserved land, representing 7.5% of the total acreage of these parcels, comprises higher elevation territory in Parcel 7 and several lower lying areas in Parcels 5 and 6 that are traversed by streams. All land not covered by the easement remained available for residential or commercial development by Pine Mountain.

The 2007 easement recites the same conservation purposes as the 2005 easement and similar conservation values. Article 2 of each easement prohibits residential, commercial, and industrial development of the respective conservation area, while permitting recreational and agricultural activity. And article 3 of each easement reserves to Pine Mountain and its successors, as exceptions to the restrictions set forth in article 2, enumerated "Reserved Rights."

The "Reserved Rights" in the 2007 easement resemble in some ways and differ in other ways from those in the 2005 and 2006 easements:

• The 2007 easement designates no "Building Areas" and permits no residential construction anywhere within the 2007 Conservation Area. It likewise reserves to Pine Mountain no rights to construct scenic overlooks, riding stables, ponds, boat storage buildings, or piers.

• Like the 2006 easement, the 2007 easement provides that Pine Mountain may construct a water tower within the 2007 Conservation Area "for the use of the provider of water to surrounding property * * * and underground pipelines from such Water Tower to the areas served by the Water Tower within the Property." The "Property" is defined as the 2,990 acres covered by Parcels 5, 6, and 7. The 2007 easement thus permits Pine Mountain to construct pipelines across the 2007 Conservation Area to serve the six Building Areas and appurtenant structures permitted by the 2006 easement, as well as any residential or commercial development constructed by Pine Mountain on other portions of Parcels 5, 6, and 7. NALT had to approve in advance the design and location of the water tower and pipelines.

• Like the 2005 and 2006 easements, the 2007 easement permits within the 2007 Conservation Area "the breeding and release of deer, quail, duck, turkey or other game animals," and it guarantees "the right of Owner and Owner's guests and invitees to hunt, trap, and otherwise harvest fish and other wildlife" from the

2007 Conservation Area. To that end, the 2007 easement permits Pine Mountain to "construct a reasonable number of wildlife hunting or observation stands and 'blinds,'" without limiting the number or location of these structures or requiring NALT's approval therefor.

• In provisions substantially identical to those in the other two easements, the 2007 easement permits Pine Mountain to construct across the 2007 Conservation Area fences, service vehicle trails, raised walkways, and outdoor recreation paths, while making clear that "[n]othing in this Conservation Easement shall be construed to create any right of access to the Conservation Area by the public." Like the other two easements, the 2007 easement permits Pine Mountain to construct within the 2007 Conservation Area various "utility installations," including sewer lines. And the 2007 easement has an amendment provision identical to those for the 2005 and 2006 easements.

C.    Pine Mountain's Tax Returns

Pine Mountain timely filed Forms 1065, U.S. Return of Partnership Income, for tax years 2005, 2006, and 2007. On these returns it claimed charitable contribution deductions of $16,550,000, $12,726,000, and $4,100,000, respectively, for its donation of the 2005, 2006, and 2007 easements. Pine Mountain included with each return an appraisal prepared by Clark, Sands & Associates, P.C. While

disagreeing with the values thus determined, respondent agrees that each appraisal was a "qualified appraisal" within the meaning of section 170(f)(11)(E)(i). Pine Mountain likewise included with each return a Form 8283, Noncash Charitable Contributions, properly executed by the appraiser and by the president of NALT.

The IRS selected Pine Mountain's 2005, 2006, and 2007 returns for examination. On January 22, 2013, the IRS issued Eddleman Properties, as Pine Mountain's tax matters partner, a separate FPAA for each year. The FPAAs disallowed the three claimed charitable contribution deductions in their entirety, determining that "the requirements of * * * section 170 have not been met." In the alternative, the FPAAs determined that "it has not been established that the value of the contributed property is as claimed."

D.  Expert Testimony

    1.    Petitioner's Experts

At trial petitioner offered, and the Court recognized, Raymond Veal as an expert in real estate appraisal, specializing in appraisals of hotels, golf courses, marinas, and commercial buildings. In performing his appraisals of the conservation easements, Mr. Veal relied on a market feasibility analysis for development of the Pine Mountain property performed by Belinda Sward, also recognized by the Court as an expert. In his appraisal of the 2005 easement Mr. Veal stated that,

"[s]hortly after the easement was granted, Westover officially annexed the subject property into its municipality." Westover did not actually annex the Pine Mountain property until March 2007, 15 months after the 2005 easement was granted. In all three appraisals Mr. Veal treated the Pine Mountain property as PUD zoned. Its zoning was not actually changed from agricultural preserve to PUD until April 23, 2007.

Mr. Veal concluded that the aggregate value of the three conservation easements was $97.37 million, almost three times higher than the aggregate value of $33,376,000 reflected on Pine Mountain's tax returns.

a.      2005 Easement

Mr. Veal opined that the value of the 2005 easement when granted was $54.69 million. On the basis of Ms. Sward's feasibility study, he concluded that the highest and best use of the 559.48 conserved acres, before imposition of the easement, would be an 844-unit residential development. Relying principally on a comparable sales method, Mr. Veal determined a "before" value of $55.95 million.

In determining the "after" value, Mr. Veal valued the ten Building Areas at $700,000 ($70,000 apiece) and the remaining conserved acreage at $560,000 (approximately $1,000 per acre). He made no adjustment for any enhancements that the easement conferred on the rest of the Pine Mountain property. Subtracting the

$1,260,000 "after" value from the $55.95 million "before" value, Mr. Veal determined a $54.69 million value for the 2005 easement.

b.  2006 Easement

On the basis of Ms. Sward's feasibility study, Mr. Veal concluded that the highest and best use of the 499.23 conserved acres, before imposition of the easement, would be a 345-unit residential development.  Relying principally on a comparable sales method, Mr. Veal determined a "before" value of $33.85 million.

In determining the "after" value, Mr. Veal valued the six Building Areas at $300,000 ($50,000 apiece) and the remaining conserved acreage at $490,000 (approximately $1,000 per acre).   He made no adjustments for the other rights reserved to Pine Mountain and the homeowners, and he made no adjustment for the enhancement that the easement conferred on the rest of the Pine Mountain property.  Subtracting the "after" value from the "before" value and making several technical adjustments, Mr. Veal determined a $33.57 million value for the 2006 easement.

c.  2007 Easement

On the basis of Ms. Sward's feasibility study, Mr. Veal concluded that the highest and best use of the 224.55 conserved acres, before imposition of the easement, would be a 130-unit residential development.  Relying principally on a com-

parable sales method, Mr. Veal determined a "before" value of $9.33 million and an "after" value of $220,000 (approximately $1,000 per conserved acre). He made no adjustments for any enhancement that the easement conferred on the rest of the Pine Mountain property. Subtracting the "after" value from the "before" value, Mr. Veal determined a $9.11 million value for the 2007 easement.

2.     Respondent's Expert

Respondent offered, and the Court recognized, Gary McGurrin as an expert in conservation easement appraisal. Mr. McGurrin concluded that the best method for valuing the three conservation easements was to consider direct sales of easements covering comparable property. He found 15 sales of easements in Alabama and Georgia between 2003 and 2009, the majority of which were sold to the U.S. Department of Agriculture. He selected for analysis the six easement sales effected closest to the valuation dates; these easements covered acreage comparable in size to the Conservation Areas. The per-acre prices of these easements ranged from $537 to $2,747; after making various adjustments, Mr. McGurrin determined that $2,000 per acre was an appropriate price for the easements at issue. He accordingly determined values of $1,119,000, $998,000 and $449,000, for the 2005, 2006, and 2007 easements, respectively.

The parties' positions concerning valuation of the three conservation easements may be summarized as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Parcels partially covered by easement | Parcel 2 | Parcels 2,5,6 | Parcels 5,6,7 |
| Original acquisition cost for Parcel(s) | $5,354,550 | $13,363,145 | $15,448,555 |
| % of acreage covered by easement | 47.0 | 17.6 | 7.5 |
| Easement value per respondent | $1,119,000 | $998,000 | $449,000 |
| Easement value per tax return | $16,550,000 | $12,726,000 | $4,100,000 |
| Easement value per petitioner | $54,690,000 | $33,570,000 | $9,110,000 |

## OPINION

## I.  Burden of Proof

The IRS' determinations in an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace and are "strictly construed." INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers generally bear the burden of proving their entitlement to all deductions claimed. INDOPCO, Inc., 503 U.S. at 84. Although the burden of proof on factual questions may sometimes shift to the Commissioner, sec. 7491(a), petitioner does not contend that this provision applies here.

II.   Charitable Contribution Deductions for Conservation Easements

   A.   Governing Statutory Framework

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year.  If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time the gift is made.  See sec. 1.170A-1(c)(1), Income Tax Regs.

The Code generally restricts a taxpayer's charitable contribution deduction for the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property."  Sec. 170(f)(3)(A).  But there is an exception to this rule for a "qualified conservation contribution."  Sec. 170(f)(3)(B)(iii).  This exception applies where:  (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the contribution is "exclusively for conservation purposes."  Sec. 170(h)(1).  The first of these requirements--that the donation consist of a "qualified real property interest"--is the initial focus of our attention here.[4]

_____

   [4]The parties agree that NALT is a "qualified organization" under section 170(h)(3).  Respondent contends that the easements were not made "exclusively for conservation purposes" under section 170(h)(1)(C).  We address that contention in connection with the 2007 easement below.  See infra pp. 52-53.

Section 170(h)(2) defines a "qualified real property interest" to include "a restriction (granted in perpetuity) on the use which may be made of the real property." Sec. 170(h)(2)(C). The regulations provide that a "perpetual conservation restriction" is a restriction--including an easement, restrictive covenant, or equitable servitude--"granted in perpetuity on the use which may be made of real property." Sec. 1.170A-14(b)(2), Income Tax Regs. "Any rights reserved by the donor in the donation of a perpetual conservation restriction must conform to the requirements" of section 170(h) and the regulations thereunder. Sec. 1.170A-14(b)(2), Income Tax Regs.

### B. Caselaw Development

Respondent contends that the easements do not constitute "qualified real property interest[s]" because the restrictions on the use that could be made of the conserved land were not "granted in perpetuity." Sec. 170(h)(2)(C). That is so, in respondent's view, because the "Reserved Rights" enumerated in article 3 of the easements enable the developer to take back supposedly conserved land and dedicate it to residential development. That development could consist of up to 16 single-family residences, as well as boathouses, riding stables, scenic overlook outbuildings, and other structures intended for the homeowners' recreation and enjoyment.

In evaluating this argument, we do not write on a clean slate. We first confronted a fact pattern of this sort in Belk v. Commissioner (Belk I), 140 T.C. 1 (2013), supplemented by Belk v. Commissioner (Belk II), T.C. Memo. 2013-154, 105 T.C.M. (CCH) 1878, aff'd, Belk v. Commissioner (Belk III), 774 F.3d 221 (4th Cir. 2014). The developer there had donated to a land trust a conservation easement over a golf course, which was surrounded by a single-family residential development. Although the easement by its terms was perpetual, the deed permitted the parties by mutual agreement "to change what property is subject to the * * * easement." Id. at 3. Specifically, the deed permitted land to be removed from the conservation area, so long as the developer substituted, and subjected to the easement, a contiguous plot of land of equal or greater size, value, and ecological quality. Id. at 3-5.

We held that the easement was not a "qualified real property interest" because it was not "granted in perpetuity." Id. at 10-11 (citing section 170(h)(2)(C)). As we explained, the taxpayers

> did not agree never to develop the golf course. Under the terms of the conservation easement, petitioners are able to remove portions of the golf course and replace them with property currently not subject to the conservation easement. Thus, petitioners have not donated an interest in real property which is subject to a use restriction granted in perpetuity. To conclude otherwise would permit petitioners a deduction for agreeing not to develop the golf course

when the golf course can be developed by substituting * * * [other] property * * *. [Ibid.]

The taxpayers noted that the Belk I easement permitted substitution of land only if the donee trust explicitly approved the substitution, which it could do after confirming that this action would have no adverse effect on the easement's conservation purposes. Id. at 3-4. The taxpayers accordingly urged that the conservation purpose was protected in perpetuity under section 170(h)(5)(A), which defines the terms under which an easement will be treated as made "exclusively for conservation purposes." Because the conservation purpose was allegedly protected in perpetuity, the taxpayers contended that the "perpetuity" requirement was satisfied.

We rejected this argument. As we explained: "[T]he section 170(h)(5) requirement that the conservation purpose be protected in perpetuity is separate and distinct from the section 170(h)(2)(C) requirement that there be real property subject to a use restriction in perpetuity." Belk I, 140 T.C. at 12. Reviewing the statute and its legislative history, we found "nothing to suggest that section 170(h)(2)(C) should be read to mean that the restriction granted on the use which may be made of the real property does not need to be in perpetuity if the conservation purpose is protected." Ibid.[5]

_____

[5] For similar reasons, we rejected the taxpayers' reliance on the deed's re-

(continued...)

The taxpayers moved for reconsideration in Belk I, and we issued a supplemental opinion to explain our denial of that motion. Belk II, 105 T.C.M (CCH) 1878. The taxpayers urged that our original Opinion had "focused too much on 'the real property'" and ignored the fact that they had "donated a use restriction granted in perpetuity." Id. at 1879. In the taxpayers' view, "as long as they agree not to develop 184.627 acres of land, the Court * * * should not be concerned with what land actually comprises those 184.627 acres." Ibid.

We rejected this argument. Our original Opinion "had focused * * * on the real property" because the statute requires a perpetual restriction "on the use which may be made of the real property." Sec. 170(h)(2)(C). We accordingly adhered to our view that "section 170(h)(2)(C) requires that taxpayers donate an interest in an identifiable, specific piece of real property." Belk II, 105 T.C.M. (CCH) at 1879.

We also rejected the taxpayers' reliance on the easement's amendment provision. That provision, substantially identical to article 6.7 of the easements involved here, contained what is commonly called a "condition subsequent" saving clause. It stated that the trust "shall have no right or power to agree to any

---

[5](...continued)
quirement that the trust approve any substitution, concluding that the granted-in-perpetuity requirement must be met even "if taxpayers and qualified organizations wish to agree otherwise." Belk I, 140 T.C. at 13.

amendments * * * that would result in this Conservation Easement failing to quali-fy * * * as a qualified conservation contribution under Section 170(h) of the Inter-nal Revenue Code." Id. at 1879 n.2. We noted that the parties had included in the easement deed "a specific, detailed provision * * * permitting substitutions," and we found that this provision clearly expressed their intention that substitutions be allowed. Id. at 1880. As a matter of contract interpretation, we concluded that this specific provision prevailed over the saving clause, which did little more than express the "taxpayer's expectations and hopes as to the tax treatment of his conduct." Ibid.

On appeal the U.S. Court of Appeals for the Fourth Circuit affirmed in a unanimous opinion. The taxpayers contended that section 170(h)(2)(C) "requires only a restriction in perpetuity on some real property, rather than the real property governed by the original easement." Belk III, 774 F.3d at 225. According to the taxpayers, the easement satisfied this requirement "because any property removed from the Easement must be replaced with property of equal value that is then sub-ject to the same use restrictions." Ibid.

The Fourth Circuit found this argument at odds with "[t]he plain language of the Code." Ibid. Section 170(h)(2)(C) requires that there be a restriction, granted in perpetuity, "on the use which may be made of the real property." Belk

III, 774 F.3d at 225. "The placement of the article 'the' before 'real property,'" the court explained, "makes clear that a perpetual use restriction must attach to a defined parcel of real property rather than simply some or any (or interchangeable parcels of) real property." Ibid.; see id. at 227 (stating that the taxpayer must grant an easement over "a single, immutable parcel at the outset").

The Fourth Circuit concluded that the Belk easement did not constitute a "qualified real property interest," reasoning as follows:

> The Easement at issue fails to meet this requirement because the real property contributed to the Trust is not subject to a use restriction in perpetuity. The Easement purports to restrict development rights in perpetuity for a defined parcel of land, but upon satisfying the conditions in the substitution provision, the taxpayers may remove land from that defined parcel and substitute other land. Thus, while the restriction may be perpetual, the restriction on "the real property" is not. * * * [Id. at 226.]

The Fourth Circuit also rejected the taxpayers' reliance on the saving clause. According to the taxpayers, the saving clause barred implementation of a land substitution if that amendment would prevent the allowance of a charitable contribution deduction under section 170(h). As the Fourth Circuit noted, a "condition subsequent" saving clause, which purports to recharacterize a transaction in the event of some adverse future occurrence, generally will not be enforced by the courts. See Belk III, 774 F.3d at 229 (citing authorities). The Fourth Circuit in

Belk III applied this general rule, stating: "[W]ere we to apply the savings clause as the Belks suggest, we would be * * * sanctioning the very same 'trifling with the judicial process'" that the Fourth Circuit had previously condemned. Id. at 230 (quoting Commissioner v. Procter, 142 F.2d 824, 827 (4th Cir. 1944), rev'g and remanding a Memorandum Opinion of this Court).

Shortly after the Fourth Circuit issued its opinion in Belk III, we decided Balsam Mountain Invs., LLC v. Commissioner, T.C. Memo. 2015-43, 109 T.C.M. (CCH) 1214. The terms of the easement there were similar to those in Belk, but the developer's ability to substitute land was more circumscribed. The deed permitted "minor alterations to the boundary of the Conservation Area" if the trust approved such substitutions after determining that the conservation purposes would not be impaired. Id. at 1215. But a substitution could be effected only within five years of the easement date, and it could result in removal of no more than 5% of the original conservation area. Ibid. The Belk easement, by contrast, imposed no time limit and no limit on how much acreage could be substituted.

We held that these distinctions made no legal difference. "The easement granted * * * in 2003 was not an interest in an identifiable, specific piece of real property" because, for five years after 2003, the taxpayer retained the right to de-velop up to 5% of that property. Ibid. As of 2003, therefore, "the easement did

not constitute a 'qualified real property interest' of the type described in section 170(h)(2)(C)." Ibid. (citing elsewhere Belk I and Belk III).

Four months later we decided Bosque Canyon Ranch, L.P. v. Commissioner, T.C. Memo. 2015-130, 110 T.C.M. (CCH) 48, vacated and remanded sub nom. BC Ranch II, L.P. v. Commissioner, 867 F.3d 547 (5th Cir. 2017). That case, like this one, involved conservation easements donated to NALT, and the terms of the easements were very similar to those at issue here. The property as a whole consisted of 3,744 acres, more than 90% of which were covered by two conservation easements. A total of 235 acres, consisting of 47 five-acre homesite parcels, was dedicated to residential development. Id. at 50.

Although the easements barred residential or commercial development within the conserved area, the developer retained numerous rights resembling those reserved by Pine Mountain. Specifically, the developer reserved the rights, within the conservation area, "to raise livestock; hunt; fish; trap; cut down trees; and construct buildings, recreational facilities, skeet shooting stations, deer hunting stands, wildlife viewing towers, fences, ponds, roads, trails, and wells." Id. at 49. As is also true here, the developer in Bosque Canyon reserved the right, by mutual agreement with NALT, to change the location of the homesite parcels within the conservation area. This right was subject to the proviso that any modification

could not, in NALT's reasonable judgment, "directly or indirectly result in any material adverse effect on any of the Conservation Purposes," and to the further proviso that "[t]he area of each homesite parcel * * * [could] not be increased." Ibid.

The taxpayers urged that their easement differed from the Belk and Balsam Mountain easements in a critical respect. Whereas the latter easements permitted the exterior boundaries of the conservation area to be modified, the Bosque Canyon easement did not. Rather, it permitted the developer to change the boundaries only of the homesite parcels--i.e., to modify their location within the conservation area, while leaving the perimeter of the conservation area unchanged. Bosque Canyon Ranch, L.P., 110 T.C.M. (CCH) at 51. The taxpayers contended that the easement thus imposed a perpetual use restriction on "a defined parcel of real property," as the Fourth Circuit and this Court in Belk had demanded. Belk III, 774 F.3d at 225; see Belk II, 105 T.C.M. (CCH) at 1879 (requiring that the easement restrict "an identifiable, specific piece of real property").

We were again unpersuaded by this distinction between the easement terms. If the developer exercised his right to change the location of homesites within the conservation area, "property protected by the * * * easements, at the time they were granted, could subsequently lose this protection." Bosque Canyon Ranch,

L.P., 110 T.C.M. (CCH) at 51. We accordingly concluded that "the restrictions on the use of the property were not granted in perpetuity" and hence that the easements did not constitute "qualified real property interest[s]" as defined by section 170(h)(2). Ibid. (citing Belk I, 140 T.C. at 10-11).

The U.S. Court of Appeals for the Fifth Circuit, in a divided opinion, vacated and remanded our decision in Bosque Canyon. BC Ranch II, L.P., 867 F.3d 547 (5th Cir. 2017). The majority "view[ed] Belk as distinguishable" and regarded our reliance on Belk as misplaced. Id. at 552. Whereas the land-substitution provision in Belk could lead to modification of the easement's exterior boundaries, the Bosque Canyon easement "d[id] not allow any change in the exterior boundaries of the easements or in their acreages." Ibid. The majority found it dispositive that "neither the exterior boundaries nor the total acreage of the instant easements will ever change: Only the lot lines on one or more [of] the five-acre homesite parcels are potentially subject to change and then only (1) within the easements and (2) with NALT's consent." Ibid. Citing the "need for flexibility to address changing or unforeseen conditions," the majority concluded that "any potential future tweaking of the boundaries of * * * homesite locations cannot conceivably detract from the conservation purposes for which these easements were granted." Id. at 553-554. The court accordingly held that "the home-

site adjustment provision does not prevent the grants of the conservation easements * * * from satisfying the perpetuity requirement of §170(h)(2)(C)." Id. at 554.

Judge Dennis dissented from the majority's disposition of this issue, finding "the attempted distinction [of Belk] unpersuasive." Id. at 562 (Dennis, J., dissenting). Although relocating homesites would not affect the easement's exterior boundaries, it would enable the developer to "lift the easement and swap the previously unprotected * * * homesites for initially protected land, thereby converting conservation habitat into residential development." Ibid. Judge Dennis emphasized that the homesite adjustment provision would allow the developer "to move the homesites anywhere within the outer boundaries of the ranch tract," with no limitation on how many homesites could be moved, how often this could be done, or how far into the future such relocations could occur. Id. at 563.

"By permitting the * * * [developer] to change the placement of the homesite parcels," Judge Dennis explained, "the modification provision expressly permits the substitution of nonprotected land * * * for land that was originally protected by the easement," thus "chang[ing] what real property is subject to the easement." Id. at 562. In Judge Dennis' view, the fact that "the substitution occurs within the outer boundaries of the * * * ranch tract makes no meaningful

difference," because the easements in any event "do not attach in perpetuity to the initially defined parcel of real property." Id. at 562-563. In short, "[b]ecause the easement does not govern a 'defined and static' parcel of land," Judge Dennis concluded that it "does not constitute a 'qualified conservation contribution' under § 170(h)." Id. at 562 (citing Belk III, 774 F.3d at 226-227).

C.    Analysis

Because Pine Mountain had its principal place of business in Alabama, appeal of this case (absent stipulation to the contrary) would lie to the U.S. Court of Appeals for the Eleventh Circuit. That court has not addressed the question presented here. Nor have we discovered, in other opinions of that court, any indications as to how it might rule on this issue.

We are not bound to follow the Fifth Circuit's BC Ranch II, L.P. opinion in cases appealable in other circuits. See Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). Upon careful reconsideration of our precedents and the relevant appellate opinions, we are not persuaded to abandon our earlier view. We think the Fourth Circuit's analysis of this issue in Belk was correct, and we think that Judge Dennis was correct in believing that the scenario presented by Bosque Canyon (and this case) cannot meaningfully be distinguished from the scenario presented by Belk.

Our thinking about this issue is well captured by the "Swiss cheese" metaphor that Judge Dennis employed. See BC Ranch II, L.P., 867 F.3d at 562 (Dennis, J., dissenting). For this purpose one must imagine the entire easement-related area as a large slice of Emmenthaler cheese. The cheese represents the real property initially restricted by the conservation easement. The holes represent the zones reserved for commercial or residential development. Section 170(h)(2)(C) requires that the land restricted by the conservation easement be protected from development in perpetuity. The statute thus bars the developer from putting any new holes in the cheese.

As relevant here, the developer could consider two techniques for putting new holes in the cheese. First, he could put new holes in the cheese and make up for it by adding an equal amount of previously unprotected land to the conservation area. That was the pattern in Belk. Alternatively, he could put new holes in the cheese and make up for it by plugging the same number of holes elsewhere in the conservation area. That was the pattern in Bosque Canyon and in the instant case. In each instance the acreage subject to the easement remains exactly the same. But in both instances the developer has achieved the impermissible objective of putting new holes in the cheese, i.e., subjecting to commercial or residential

development land that was supposed to be protected in perpetuity from such development.[6]

Like Judge Dennis, we are unable to discern any meaningful legal distinction between these two paths to the same bottom line. In both scenarios, the developer has retained the right to develop a portion of the conservation area by substituting other property. The only difference among Belk, Bosque Canyon, and this case is whether the other property lies inside or adjacent to the conservation area. We do not see why it matters where the other property lies. What matters is whether there is a perpetual use restriction on "the real property" covered by the easement at the time the easement is granted. Sec. 170(h)(2)(C).

---

[6]In Bosque Canyon and in this case, the easement was held by NALT, the deed of easement was based on a model NALT form, and the terms of the easement were substantially identical. The dissenting opinion nevertheless urges that Bosque Canyon is distinguishable because the homesite parcels in that case "were completely free of the easements." See dissenting op. p. 78. We do not find the distinction meaningful, and in any event it is a distinction without a difference. In Bosque Canyon, the conservation area was defined as a tract of land, excluding 25 homesite parcels described in an attachment. See 100 T.C.M. (CCH) at 49-51. Here, the 2005 and 2006 conservation areas are defined as tracts of land, with the developer reserving the right to construct therein 16 homesite parcels described in an attachment. In both cases, the homesite parcels are exempt from the conservation easement because they permit residential development that is otherwise forbidden. See infra pp. 49-51. In any event, the key point under section 170(h)(2)(C) is that both easements have the same defect. By permitting the homesite parcels to be relocated to other sections of the conservation area, the deed allows the developer to subject to residential development land that was supposed to be protected in perpetuity from any form of development.

We will accordingly adhere in this case to the approach we embraced in Belk and Bosque Canyon. Adopting that approach, our analysis of the three easements at issue is as follows.

1.    2006 Easement

We begin with the 2006 easement because it presents a somewhat novel pattern. The 2006 easement permits Pine Mountain to establish within the 2006 Conservation Area six Building Areas, each as large as one acre. Each Building Area may include a single-family dwelling plus "a shed, garage, gazebo, and pool," and the owner of each Building Area may construct a 5,000-square-foot barn within 1,000 feet of its perimeter. However, the 2006 easement does not specify, either in the deed itself or in an attached plat, the locations of the six Building Areas. And it places no limitations on where within the 2006 Conservation Area such Building Areas may be located, except to say that these locations must be "approved in advance" by NALT.

It seems clear to us that the 2006 easement does not embody "a restriction (granted in perpetuity) on the use which may be made of the real property." See sec. 170(h)(2)(C). Although the restriction placed by the easement is perpetual, "the restriction on 'the real property' is not." Belk III, 774 F.3d at 226 (quoting section 170(h)(2)(C)). Pine Mountain remained free to build a six-acre residential

development within the 2006 Conservation Area, thus converting to commercial use land that was supposed to be protected in perpetuity from development. Indeed, it was impossible to define, when the 2006 easement was granted, what "real property" would actually be restricted from development, because the residential lots could literally be placed anywhere within the 2006 Conservation Area. As a result, the perpetual use restriction did not attach at the outset "to a defined parcel of real property" or to "a single, immutable parcel" of land. Id. at 225, 227.

NALT had to approve the precise location of the six residences within the 2006 Conservation Area. By so doing, NALT might minimize the derogation of conservation values that the subdivision caused and perhaps ensure that "the conservation purpose [wa]s protected in perpetuity." Sec. 170(h)(5)(A). But this does not change the fact that the easement, when granted, did not create a perpetual use restriction on a defined parcel of land, as required by section 170(h)(2)(C). Because the 2006 easement does not constitute a "qualified real property interest," Pine Mountain could not claim for the donation of this interest a charitable contribution deduction under section 170(f)(3)(B)(iii) and (h)(1).

2.    2005 Easement

Most of the 2005 Conservation Area consists of ridgelines and higher elevation land in the northwest portion of Parcel 2.  The balance consists of lower lying land around a man-made lake near the center of Parcel 2.  Overall the easement covers about 47% of the acreage of Parcel 2.

Apart from the acreages involved, the 2005 easement is substantially similar to the easements involved in Bosque Canyon.  It reserves to Pine Mountain or individual homeowners the rights to construct one single-family dwelling and appurtenant structures within each of ten "Building Areas" inside the 2005 Conservation Area.  Although the deed itself does not limit the size or location of these ten Building Areas, an attached plat shows each Building Area as a one-acre lot situated around the man-made lake.

Article 3.16, however, provides that the "boundaries of the Building Areas may be modified by mutual agreement" of Pine Mountain and NALT.  Such modification is subject to the proviso that "the areas of a Building Area shall not be increased" and that the boundary modifications shall not, in NALT's "reasonable judgment," adversely affect conservation purposes.  Article 3.16 thus permits the Building Areas to be relocated (with NALT's consent) to higher elevation zones or to other locations within the 2005 Conservation Area.

Besides permitting the relocation of homesites, the easement permits Pine Mountain to build within the 2005 Conservation Area other structures and facilities appurtenant to the residential development. These include:

• at least ten barns, each of which may include "an apartment for occupancy by a caretaker and such caretaker's family";

• two scenic overlooks, one of which "may include a guest bedroom," occupying up to six acres in the aggregate;

• at least one riding stable and indoor riding ring, occupying up to ten acres in the aggregate;

• up to 14 piers and boat launches, which may include four "common boat launch facilit[ies] with associated boat storage building[s]";

• up to five ponds, occupying up to 25 acres in the aggregate, which may apparently be encumbered by piers and boat launch facilities; and

• a reasonable (but otherwise unlimited) number of wildlife hunting stands or blinds to facilitate hunting and shooting by homeowners and their guests.

The easement does not specify the location of any of these facilities, and their location could change if the location of the Building Areas changed. Although NALT's approval is generally required, its approval for certain facilities (such as the man-made ponds) "shall not be unreasonably withheld." For other

facilities, such as the piers, boat launches, boat storage buildings, and hunting blinds, no approval or prior review by NALT is needed.

We conclude that the rights reserved to Pine Mountain, considered in their entirety, prevent the 2005 easement from constituting a "qualified real property interest." See sec. 170(h)(2). As in Bosque Canyon, the easement deed allows all ten residences to be moved from the man-made lake to other, possibly more desirable, locations within the 2005 Conservation Area. And as in Bosque Canyon, the easement places no limits on how many homesites can be moved, how often this can be done, or how far into the future such relocations can occur.

The 2005 easement also permits Pine Mountain to construct, anywhere within the 2005 Conservation Area, a variety of other buildings. At least 11 of these buildings may include additional living quarters. All of these facilities are intended for the recreational use of the homeowners and their guests. Collectively, they have the effect of expanding the residential development well beyond the ten acres consumed by the Building Areas alone. Returning to Judge Dennis' "Swiss cheese" metaphor, Pine Mountain has reserved the right, not only to put new holes in the cheese for the ten residences, but to put 20 acres of extra holes in the cheese for structures appurtenant to these residences.

The dissenting opinion urges that the 2005 and 2006 easements satisfy the granted-in-perpetuity requirement of section 170(h)(2)(C), notwithstanding the developer's right to take back conserved land by relocating homesites, because the 16 Building Areas "are still within the * * * easements." See dissenting op. p. 81. But while the homesites are concededly within the outer perimeter of the conservation area, they are not "subject to the easements" in any meaningful sense. The stated purpose of the easements is to protect natural habitats of fish and wildlife and to preserve open space that provides scenic enjoyment to the general public. The easement deeds accordingly forbid all residential development and specifically prohibit the erection of any "structure," defined to include any "building, platform, shed, bin, shelter" or any other "assembly of material forming a construction for occupancy."

In each of the 16 Building Areas the developer can construct a single-family residence and "other structures customarily accessory to residential use, including but not limited to a shed, garage, gazebo, and pool," as well as a 5,000-square-foot barn that may include "an apartment for occupancy by a caretaker and such caretaker's family." As sites for a standard upscale residential development, the 16 Building Areas are exempt from the conservation easement because they permit uses antithetical to its conservation purposes.

The dissent speculates that the homeowners might still be subject to other restrictions listed in article 2 of the easement deed.  See dissenting op. pp. 74, 91-92.  But the dissent does not cite a single operative restriction that would actually be imposed by the easement.  As fee simple owners of real property, the homeowners would be exempt from the easement's restrictions on erecting structures, building roads, building driveways, cutting trees, removing rock and topsoil, drilling wells, placing signs, and engaging in recreational activities.  Homeowners would presumably be barred from converting their single-family homes to commercial or industrial use.  See id. p. 92.  But that restriction is ultimately imposed not by the easement but by the zoning ordinance, which permits only agricultural use and "planned unit development."  The only other restriction mentioned by the dissent is "the prohibition on dumping trash on the land."  See ibid.  But the dissent offers no record evidence to support the proposition that a fee simple owner of a one-acre residential tract would be prevented from doing this in his back yard.

Our dissenting colleague insists that the distinction he draws between the easement terms in Bosque Canyon and in this case "is a substantive distinction, not merely a difference in names."  See id. p. 81.  We disagree.  The dissent would make the outcome turn on a purely formal choice exercised by the draftsman when

defining the metes and bounds of the conservation easement. It makes no difference to anyone--the land trust, the developer, or the homeowners--whether the 16 Building Areas are within or without those metes and bounds. Either way, the developer has the right to construct a 16-unit residential development that is exempt, for all practical purposes, from the restrictions imposed by the easement.

For these reasons, we conclude that the perpetual use restriction set forth in the 2005 easement did not attach, as required by section 170(h)(2)(C), "to a defined parcel of real property" or to "a single, immutable parcel" of land. See Belk III, 774 F.3d at 225, 227. Because the 2005 easement therefore does not constitute a "qualified real property interest," Pine Mountain could not claim for the donation of this interest a charitable contribution deduction under section 170(f)(3)(B)(iii) and (h)(1).

### 3. 2007 Easement

Unlike the other two easements, the 2007 easement designates no "Building Areas" and permits no residential construction anywhere within the 2007 Conservation Area. It likewise reserves to Pine Mountain no rights to construct scenic overlooks, barns, riding stables, boat storage buildings, piers, or other structures appurtenant to residential development.

Apart from hunting blinds, the only structure permitted within the 2007 Conservation Area is a water tower to which may be attached underground pipes to provide water service to other parts of the Pine Mountain property. Although the water tower, if poorly placed, could conceivably affect whether "the conservation purpose is protected in perpetuity" under section 170(h)(5)(A), we conclude that it has no effect on whether the use restriction attaches in perpetuity "to a defined parcel of real property" as required by section 170(h)(2)(C). See Belk III, 774 F.3d at 225. Because the 2007 easement does not permit Pine Mountain, under any circumstances, to place any new holes in the cheese, we hold that it constitutes a "qualified real property interest."

### 4. Respondent's Other Arguments

Holding as we do that the 2007 easement satisfies the "granted in perpetuity" requirement of section 170(h)(2)(C), we must address the other contentions respondent advances against Pine Mountain's claim to a charitable contribution deduction. Respondent advances two such arguments. One is based on section 170(h)(1)(C), which requires that the use restriction be "exclusively for conservation purposes." The other argument is based on the general provision of the easement deed that permits amendments.

Respondent agrees that the easement protects at least one of the "conservation purposes" enumerated in section 170(h)(4). But he contends the 2007 easement was not made "exclusively for conservation purposes" under section 170(h)(1)(C) because "the conservation purpose [wa]s not protected in perpetuity." See sec. 170(h)(5)(A). Petitioner presented testimony from an NALT biologist who concluded that none of the rights reserved to Pine Mountain would impair the easement's conservation purposes or prevent those purposes from being "protected in perpetuity." Respondent adduced no contrary evidence, in the form of expert testimony or otherwise.

In prior cases we have treated the question whether a conservation interest is "protected in perpetuity" as a question of fact. See Glass v. Commissioner, 124 T.C. 258, 282-283 (2005), aff'd, 471 F.3d 698 (6th Cir. 2006); Gorra v. Commissioner, T.C. Memo. 2013-254, 106 T.C.M. (CCH) 523, 531-532; Butler v. Commissioner, T.C. Memo. 2012-72, 103 T.C.M. (CCH) 1359, 1366-1367, 1384. There was no conflicting testimony as to whether the conservation purposes underlying the 2007 easement were protected in perpetuity. We find as a fact that these purposes were so protected and for that reason reject respondent's first argument.

Respondent's second argument is based on article 6.7, the general amendment provision of the easement deed. The parties there recite that "circumstances could arise which could justify the modification of certain of the restrictions contained in this Conservation Easement." Article 6.7 accordingly provides that Pine Mountain and NALT "shall mutually have the right, in their sole discretion, to agree to amendments to this Conservation Easement which are not inconsistent with the Conservation Purposes." It appears that many conservation deeds of easement include amendment provisions of this sort.[7]

Respondent contends that article 6.7 could enable the parties to amend the 2007 easement in ways that would clearly violate the statutory "perpetuity" requirements, e.g., by reducing the size of the 2007 Conservation Area or by permitting residential construction within it. But it is hard to imagine how NALT could conscientiously find such amendments to be "consistent with the conservation purposes" set forth in the easement. Respondent thus appears to contend that the easement's restrictions should be deemed "nonperpetual" at the outset because of

---

[7]According to the Land Trust Alliance, Inc., land trusts in the United States held more than 40,000 conservation easements in 2015, and amendment provisions substantially similar to article 6.7 are "widely used" in these documents. See Amicus Curiae Brief on Behalf of Land Trust Alliance, Inc., at 1,10-11, Sells v. Commissioner, T.C. Dkt. No. 6267-12 (filed March 22, 2017).

the risk that the qualified organization might be unfaithful to the charitable purposes on which its exemption rests.

Both we and the Courts of Appeals have rejected similar arguments previously. For example, in Simmons v. Commissioner, 646 F.3d 6 (D.C. Cir. 2011), aff'g T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, the historic preservation deed of easement reserved to the trust the right to consent to changes in the conserved facade and to abandon certain rights under the easement. We held that this power did not disqualify the easement under section 170(h). Simmons v. Commissioner, 98 T.C.M. (CCH) at 214. The D.C. Circuit affirmed, holding that "[t]he clauses permitting consent and abandonment, upon which the Commissioner so heavily relies, have no discrete effect upon the perpetuity of the easements." Simmons, 646 F.3d at 10. As the D.C. Circuit noted, "[a]ny donee might fail to enforce a conservation easement, with or without a clause stating that it may consent or abandon its rights, and a tax-exempt organization would do so at its peril." Id.; accord, e.g., Kaufman v. Shulman, 687 F.3d 21, 27-28 (1st Cir. 2012), vacating in part 134 T.C. 182 (2010) and 136 T.C. 294 (2011); Friedberg v. Commissioner,

T.C. Memo. 2011-238, 102 T.C.M. (CCH) 356, 372-373, <u>supplemented by</u> T.C. Memo. 2013-224.[8]

The 2007 easement involves a conveyance, which is a form of contract. Generally speaking, the parties to a contract are free to amend it, whether or not they explicitly reserve the right to do so. <u>See</u> 2 Restatement, Contracts 2d, sec. 311 cmt. a (1981). Viewed from this perspective, this portion of article 6.7 is reasonably regarded as a <u>limiting</u> provision, confining the permissible subset of amendments to those that would not be "inconsistent with the Conservation Pur-poses." This text tracks the Secretary's regulation governing the "enforceable in perpetuity" requirement, which provides that any retained interest "must be subject to legally enforceable restrictions * * * that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation." Sec. 1.170A-14(g)(1), Income Tax Regs.

Respondent's argument would apparently prevent the donor of any ease-ment from qualifying for a charitable contribution deduction under section 170(h) if the easement permitted amendments. We find no support for that argument in

---

[8]<u>Cf.</u> <u>Butler</u>,103 T.C.M. (CCH) at 1381, 1384 (holding that a 2003 conserva-tion easement qualified for deduction under section 170(h) even though it had ac-tually been amended). The <u>Belk</u> easement included an amendment provision virtually identical to that involved here. <u>See</u> <u>Belk I</u>, 140 T.C. at 4 n.8. We did not find that provision (as opposed to the land substitution provision) problematic.

the statute, the regulations, the decided cases, or the legislative policy underlying the statute.  We accordingly reject both of respondent's additional arguments against Pine Mountain's claim to a charitable contribution deduction for the 2007 easement.

D.    Valuation of the 2007 Easement

Petitioner argues for an overall charitable contribution deduction of $97.37 million, of which $9.11 million is attributable to the 2007 easement.  Petitioner paid $37 million for the entire Pine Mountain property, comprising 6,224 acres.  The three easements collectively cover only 1,283 acres, or 20.6% of the property, leaving 79.4% available for commercial or residential development.  Because the easements were placed on the various parcels within two years of their acquisition, petitioner's valuations presuppose a large increase in value over a very short time.  The limited partners paid about $45 million for their 50% interest in the partnership, and petitioner's valuations would afford them a charitable contribution deduction of $48.69 million, $3.69 million more than their entire capital investment.  And they would still own a 50% interest in the remaining 4,941 acres, all of which is available for commercial or residential development.

Given our disposition, we need determine the fair market value only of the 2007 easement.  That value is determined in a separate Memorandum Opinion,

T.C. Memo. 2018-214, filed concurrently with this Opinion.  To implement the foregoing,

An appropriate decision will be

entered.

Reviewed by the Court.

FOLEY, GALE, THORNTON, MARVEL, GUSTAFSON, KERRIGAN, BUCH, NEGA, PUGH, and ASHFORD, JJ., agree with this opinion of the Court.

MORRISON, J., dissenting:  The opinion of the Court holds that neither the 2005 nor the 2006 easement is an interest in real property that is a perpetual restriction on the use of real property within the meaning of section 170(h)(2)(C)-- primarily because the 2005 easement deed allows the owner of the underlying land to build a house on each of 10 building areas and because the 2006 easement deed allows the owner of the underlying land to build a house on each of 6 building areas.  I disagree.  Despite these building rights, the land in the 16 building areas is still subject to the easements.  See infra part I.  Therefore, section 170(h)(2)(C) does not preclude deductions for the contributions of the 2005 and 2006 easements.  I would, however, disallow a deduction for the contribution of the 2006 easement on another ground:  The easement does not protect conservation purposes in perpetuity under section 170(h)(5)(A).  See infra part II.  As for the contribution of the 2005 easement, I would allow a deduction of $27,904,500.  This is the value of the 2005 easement, in my view.  See infra part III.

I explain these views in the opinion below, which has three parts:

I.      Each of the 2005, 2006, and 2007 easements is an interest in real property that is a perpetual restriction on the use of real property within the meaning of section 170(h)(2)(C) and is therefore a "qualified real property interest" within the meaning of section 170(h)(1)(A).

II.    The 2005 and 2007 easements protect conservation purposes in perpetuity within the meaning of section 170(h)(5)(A).  However, the 2006 easement does not.  Therefore it was not contributed exclusively for conservation purposes.  See sec. 170(h)(1)(C).

III.   The fair market value of the 2005 easement is $27,904,500.

Some necessary background follows.

A deduction is allowed for a charitable contribution.  Sec. 170(a)(1); sec. 1.170A-1(c)(1), Income Tax Regs.  However, a general rule in section 170(f)(3)(A)–subject to exceptions--prohibits a deduction for a charitable contribution of an interest in property which consists of less than the taxpayer's entire interest in the property.  See Graev v. Commissioner, 140 T.C. 377, 391 (2013); sec. 1.170A-14(a), Income Tax Regs.  It is undisputed that each of the three easements granted by Pine Mountain Preserve, LLLP (Pine Mountain), is an interest in property consisting of less than Pine Mountain's entire interest in the property.  Therefore, section 170(f)(3)(A) bars Pine Mountain from deducting charitable contributions for the 2005, 2006 and 2007 easements--unless one of the section 170(f)(3)(A) exceptions applies.  One such exception is for a contribution that constitutes a "qualified conservation contribution".  Sec. 170(f)(3)(B)(iii).  This is the exception that Pine Mountain's tax matters partner, Eddleman

Properties (petitioner), relies on to attempt to avoid the partial-interest rule of section 170(f)(3)(A).

A "qualified conservation contribution" is defined by section 170(h)(1) as a contribution--

> (A) of a qualified real property interest,
>
> (B) to a qualified organization,
>
> (C) exclusively for conservation purposes.

As can be seen from the text of section 170(h)(1) quoted above, one of the three requirements for a contribution to be a "qualified conservation contribution" is that the contribution be "of a qualified real property interest". Sec. 170(h)(1)(A). A "qualified real property interest" is defined by section 170(h)(2) as

> any of the following interests in real property:
>
> > (A) the entire interest of the donor other than a qualified mineral interest,[1]

---

[1]The term "qualified mineral interest" is defined by sec. 170(h)(6) as (1) subsurface oil, gas, or other minerals and (2) the right to access such minerals. It has been explained that the phrase "the entire interest of the donor other than a qualified mineral interest" in sec. 170(h)(2)(A) refers to a "gift with retained mineral rights". Janet L. Madden, "Tax Incentives for Land Conservation: The Charitable Contribution Deduction for Gifts of Conservation Easements", 11 B.C. Envtl. Aff. L. Rev. 105, 133 (1983) (citing sec. 170(h)(6)); see also Kelly A. Cole,

(continued...)

(B) a remainder interest, and

(C) a restriction (granted in perpetuity) on the use which may be made of the real property.

Eddleman Properties asserts that the easements contributed by Pine Mountain Preserve are in the section 170(h)(2)(C) category, i.e., that the easements are interests in real property that are perpetual restrictions on the use of the real property. Such an interest is also referred to as a "perpetual conservation restriction" by the regulation governing qualified conservation contributions, section 1.170A-14, Income Tax Regs. See id. para. (b)(2).

The second requirement for a contribution to be a "qualified conservation contribution" is that the contribution be made "to a qualified organization". Sec. 170(h)(3). The parties agree that NALT is a "qualified organization". Therefore, there is no dispute about the second requirement.

_____

[1](...continued)
"A Market-Based Approach to the Protection of Instream Flow: Allowing a Charitable Contribution Deduction for the Donation of a Conservation Easement in Water Rights", 14 Hastings W.-Nw J. Envtl. L. & Pol'y 1153, 1160 (2008) ("Section 170(h)(6) * * * means that a landowner may sever the surface estate from the subsurface estate. Thus, the donor landowner may qualify for a charitable deduction for donating the development rights to his or her entire surface estate while retaining his or her rights to the subsurface estate. Because of the explicit exclusion, the donor's deduction is not barred by the 'entire interest' requirement.").

The third requirement for a contribution to be a "qualified conservation contribution" is that the contribution be "exclusively for conservation purposes." Sec. 170(h)(1)(C). Section 170(h)(5)(A) elaborates on this requirement. It provides: "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity."

The IRS's arguments against the deductions for the easements can be summarized in general terms as follows: (1) none of the three easements meets the definition of a qualified real property interest, see sec. 170(h)(2); (2) even if each easement meets the definition of a qualified real property interest, the easements do not protect conservation purposes in perpetuity, and therefore, under section 170(h)(5)(A), the contributions of the easements are not exclusively for conservation purposes; and (3) even if each of the easements is a qualified real property interest and protects the conservation purposes in perpetuity, the values of the easements are lower than the values urged by Eddleman Properties and therefore the correct amounts of the deductions are less than the amounts sought by Eddleman Properties. As to the third IRS argument--regarding the values of the easements--the following table shows the amounts in dispute:

Values of the 2005, 2006, and 2007 easements

| Year | IRS | Eddleman Properties |
|------|-----|---------------------|
| 2005 | $1,119,000 | $54,690,000 |
| 2006 | 998,000 | 33,570,000 |
| 2007 | 449,000 | 9,110,000 |

The three IRS arguments are discussed in greater detail infra parts I, II, and III, respectively.

I now address the burden of proof. The petitioner is Eddleman Properties. Pursuant to the usual rule of Tax Court litigation, the burden of proof is on the petitioner. This burden includes both the burden of production and the burden of persuasion. Cozzi v. Commissioner, 88 T.C. 435, 443-444 (1987). The burden of production will be satisfied if the petitioner comes forward with enough evidence to support a factual finding. Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). The burden of persuasion will be satisfied if the petitioner shows that, on the basis of the evidence, the fact is more probable than not. Merkel v. Commissioner, 109 T.C. 463, 476 (1997) (citing 2 McCormick on Evidence, sec. 339, at 439 (4th ed. 1992)), aff'd, 192 F.3d 844 (9th Cir. 1999). Although Eddleman Properties bears the burden of proof,[2] my view of the facts would be the

_____

[2]Eddleman Properties filed discovery motions seeking to ascertain the theories the IRS would assert against the charitable-contribution deductions for the three easements. In resolving the discovery motions, the Court held a pretrial
(continued...)

same even if the IRS were to bear the burden of proof. I agree with the findings of fact in the section of the opinion of the Court titled "Findings of Fact".

I.     Each of the easements is a "qualified real property interest".

As explained above, a "qualified real property interest" includes an interest in real property that is a restriction (granted in perpetuity) on the use of the real property. Sec. 170(h)(2)(C). In Belk v. Commissioner (Belk I), 140 T.C. 1, 10-11 (2013), supplemented by Belk v. Commissioner (Belk II), T.C. Memo. 2013-54, aff'd, Belk v. Commissioner (Belk III), 774 F.3d 221 (4th Cir. 2014), we held that a conservation easement was not such an interest if the donor of the easement could change what lands were subject to the easement. Analogizing the Pine Mountain easements to the easement in Belk, the IRS argues that none of the Pine Mountain easements is a "qualified real property interest".

Before evaluating the IRS's argument, it is first helpful to describe the relevant provisions of the 2005 easement deed. The 2005 easement deed is a

---

[2](...continued)
hearing on March 18, 2015, in which it required the IRS to identify all of its theories at the hearing or bear the burden of proof on any theories not so identified. Eddleman Properties suggests that, at the hearing, the IRS failed to identify its argument that the easements did not protect conservation purposes in perpetuity within the meaning of sec. 170(h)(5)(A). This suggestion is made on page 33, n. 13 of Eddleman Properties' answering brief. I disagree with the suggestion. The IRS described this argument at the hearing. Its description is found on pages 25-28 of the hearing transcript.

recorded agreement between Pine Mountain and NALT. Article 1 of the easement deed grants to NALT a "perpetual" easement over the "conservation area". Directly preceding article 1 is the preamble to the easement deed, which defines the conservation area as a 559.48-acre area of land identified in exhibits A and B attached to the easement deed. These documents--consisting of three maps and a description of "metes and bounds"--set forth the exact boundaries of the 559.48 acres of land. Article 2 of the easement deed provides that Pine Mountain and any future owners of the conservation area are bound by the restrictions in article 2 on their use of the conservation area, "subject to and excepting only" the rights reserved to them in article 3. Article 2 contains many restrictions, one of which is article 2.1, which prohibits the use of the conservation area for residential, commercial, institutional, or industrial purposes. Article 3, which reserves various rights to the landowner, permits the landowner to construct a house on each of 10 "building areas" within the conservation area. The size and location of each building area is specified in the easement deed. The specified building areas are clustered around a small pre-existing man-made lake. (The lake is entirely within the 559-acre conservation area.) The total size of the building areas is 10 acres. In addition to the houses, article 3 permits the construction of a 5,000-square-foot barn within 1,000 feet of each of the 10 building areas, provided that the barn

location is approved in advance by NALT. Article 3 permits the construction of 10 piers on the lake.

As explained above, the boundaries of the 10 building areas are exactly specified by the easement deed's preamble and the documents attached to the easement deed. However, article 3.16 allows the boundaries of the 10 building areas to be modified by mutual agreement of (1) the owner of the portion of the conservation area that is subject to the boundary modification and (2) NALT. A boundary modification is permitted only if three conditions are met. First, the modification of the boundary must not, in NALT's reasonable judgment, directly or indirectly result in any material adverse effect on any of the "conservation purposes" of the easement. The "conservation purposes" of the easement are defined in the preamble to the easement deed as the following: (1) preservation of the conservation area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem and (2) preservation of the conservation area as open space which provides scenic enjoyment to the general public and yields a significant public benefit. Second, the acreage of the building areas cannot be increased. Third, the modification must be set forth in a recorded, written, amendment to the easement deed signed by (1) the owner of the land in the portion of conservation area that is subject to the boundary modification and (2) NALT.

Article 6.7 of the easement deed states that Pine Mountain and NALT "recognize that circumstances could arise which would justify the modification of certain of the restrictions contained in this Conservation Easement." Article 6.7 provides that "[t]o this end", NALT and the owner of the land in the conservation area have the right "in their sole discretion" to agree to amendments to the conservation easement deed which are not inconsistent with the conservation purposes. Article 6.8 provides that the easement runs with the land and is binding on Pine Mountain and any future owners of the land unless otherwise provided in the easement deed.

The IRS first contends that article 6.7 permits the external boundary of the conservation area (that is, the boundary of the 559-acre area that is restricted by the easement, as opposed to the boundaries of each of the building areas) to change such that eased land could be substituted with non-eased land. Therefore, the IRS contends that the 2005 easement is similar to the easement in Belk I, 140 T.C. at 3-4, which restricted the use of land in a defined "Conservation Area" but permitted the replacement of land in the original conservation area with land outside the original conservation area.

The analogy is inapt. In my view, article 6.7 of the 2005 easement deed does not permit the modification of the boundaries of the conservation area.

Although article 6.7 permits amendments to the "[e]asement", it does so expressly to address those "circumstances" under which a "modification" to the "restrictions" in the easement deed is justified. The word "restrictions" in article 6.7 is, in context of the other provisions in the easement deed, best interpreted as a reference to the restrictions imposed on the use of the conservation area, not a reference to the boundary of the conservation area. The "restrictions" of the easement are set forth in article 2. Article 2 is not where the boundary of the conservation area is identified. The boundary is identified in the preamble to the easement deed through reference to documents attached to the easement deed. Therefore, article 6.7 does not permit an amendment that would change the boundary of the conservation area.

The 2006 and 2007 easement deeds each contain an article 6.7 with the same wording as article 6.7 in the 2005 easement deed. The IRS contends that the ubiquitous article 6.7 similarly disqualifies each of the 2006 and 2007 easements from being a "qualified real property interest". For the reasons given above with respect to the 2005 easement, however, I would hold that article 6.7 does not prevent either of the 2006 and 2007 easements from being a "qualified real property interest." The existence of article 6.7 is the only reason the IRS contends that the 2007 easement is not a "qualified real property interest".

The opinion of the Court gives its own reasons for rejecting the IRS's article 6.7 argument. I disagree with those reasons. The Court asserts that article 6.7 of the easement deeds, which allows the easement deeds to be amended, does not violate the granted-in-perpetuity requirement of section 170(h)(2)(C) because "it is hard to imagine how NALT could conscientiously find such amendments to be 'consistent with the conservation purposes' set forth in the easement." See op. Ct. p. 54. While it is true that article 6.7 provides that no amendment can be agreed to by Pine Mountain and NALT unless the amendment is not inconsistent with the conservation purposes, this does not require NALT to review proposed amendments to see whether the amendments comply with section 170(h)(2)(C). Remember, section 170(h)(2)(C) requires the easement to be an "interest[] in real property" that is "a restriction (granted in perpetuity) on the use which may be made of the real property." Section 170(h)(2)(C) does not refer to conservation purposes. That concept is found in the other perpetuity test, section 170(h)(5)(A), which bars a deduction "unless the conservation purpose is protected in perpetuity." The opinion of the Court mixes up the two tests and makes the unsupported assumption that NALT will refuse to consent to amendments that would bar a deduction for the donation of the easement under section 170(h)(2)(C). This unrealistically supposes that NALT will essentially act as a tax

compliance officer. (The theory of the opinion of the Court is not advanced by Eddleman Properties. The Court would have been on more solid ground had it adopted my interpretation of article 6.7, that, as a matter of contractual interpretation, article 6.7 does not allow changes to the boundaries of the easement. This issue of interpretation was actually raised by the parties.) In addition to making unfounded assumptions about NALT's future behavior, the opinion of the Court makes radical claims about the consequences of the IRS's interpretation of article 6.7. The Court asserts that article 6.7 is similar to the amendment provisions in many other conservation easement deeds. See op. Ct. p. 54. The Court supports this assertion by citing an amicus brief filed by the Land Trust Alliance in another case, Sells v. Commissioner, T.C. Dkt. No. 6267-12 (filed March 22, 2017). See op. Ct. note 7. This Sells brief, according to the opinion of the Court, says that "amendment provisions substantially similar to article 6.7 of the Pine Mountain easement deeds are 'widely used'". But the brief actually states that the amendment provision in the easement deed in Sells is widely used. The brief refers to the "widely used amendment provision in the instant case [i.e., Sells]". Amicus brief at 10, Sells v. Commissioner, T.C. Dkt. No. 6267-12. This is a significant problem for the Court. The amendment clause in the Sells easement deed is different from the amendment clause in the Pine

Mountain easement deeds because the Sells easement deed does not refer to "restrictions", a word that is critical to my interpretation of article 6.7 of the Pine Mountain easement deeds.[3] Thus, the claim in the amicus brief in Sells is irrelevant to Pine Mountain's case. Furthermore, the Land Trust Alliance amicus brief in Sells does not recite any specific words from the amendment clauses of any easements. Thus, the Sells brief's claim is unsupported. The Court recognized a similar problem when the Land Trust Alliance moved to file an amicus brief in Pine Mountain's case that made the unsubstantiated claim that the general amendment clause in the Pine Mountain deeds is widely used. The proffered brief referred to the "widely used amendment provision in the instant case [i.e., Pine Mountain's case]". The Court denied the motion by the Land Trust Alliance to file an amicus brief in Pine Mountain's case, explaining that the

---

[3]Reprinted below is the amendment clause in the easement deed in Sells:

24. Amendment. If circumstances arise under which an amendment to or modification of this Deed would be appropriate, Grantor and Grantee are free to jointly amend this Deed; provided that no amendment shall be allowed that will affect the qualification of this Conservation Easement or the status of Grantee under any applicable laws, including Code of Alabama § 35-18-1, et seq. or Section 170(h) of the Internal Revenue Code of 1954, as amended, and any amendment shall be consistent with the purpose of this Deed, and shall not affect its perpetual duration. Any such amendment shall be recorded in the official records of Calhoun County, Alabama.

amicus brief does "not reliably inform the Court of the exact wording of the other conservation easements." Neither the amicus brief in Sells (which is relied on by the opinion of the Court) nor the proposed amicus brief in Pine Mountain's case is reliable. Neither brief should affect our analysis of article 6.7. Finally, in wrapping up its discussion of article 6.7, the opinion of the Court misleadingly summarizes the IRS's argument. It says that the IRS's article 6.7 argument "would apparently prevent the donor of any easement from qualifying for a charitable contribution deduction under section 170(h) if the easement permitted amendments." See op. Ct. p. 56. Actually, the IRS argued only that the particular amendment clause in the Pine Mountain easement deeds, found in article 6.7 of each easement deed, prevented the donor of the easements from qualifying for a deduction. See Opening Brief for Respondent, at 55-56. The IRS's argument regarding article 6.7 of the three Pine Mountain easement deeds is not an attack on all amendment clauses in all easement deeds. In summary I dissent from the various ways in which the opinion of the Court mishandles the article 6.7 issue:

- its claim that article 6.7 is widely used and its circumvention of the amicus order in this case to make this claim;

- its prediction that NALT will use its power under article 6.7 to act as a tax compliance officer for Pine Mountain, a speculation that is not urged by either party;

● its failure to adopt my approach to this issue--which is to interpret the text of these particular easement deeds, no matter what others say, in holding that change in the easement boundaries is not what is permitted by article 6.7, thus resolving the issue raised by the parties in this case; and

● its mischaracterization of the IRS's argument.

Next the IRS argues that neither the 2005 easement nor the 2006 easement is a "qualified real property interest" because of the following features of the two easements: (1) the 2005 easement deed permits the owner of the land in the conservation area to build 10 houses, (2) the 2006 easement deed permits the owner of the land in the conservation area to build 6 houses, and (3) both easement deeds permit the owner of the land in the conservation area to build ancillary buildings (such as barns, stables, piers, boat launches, boat-storage facilities, sheds, garages, gazebos, pools, and a lodge or clubhouse for guests), driveways, and parking areas. In Belk I, 140 T.C. at 10, on which the IRS (and the opinion of the Court) relies, the easement was held not to be a "qualified real property interest" because the owner of the underlying land could "change what property is subject to the conservation easement." Although the 2005 and 2006 Pine Mountain easement deeds permit landowners to construct houses and structures, they do not relieve the landowners of all of the restrictions of the easements with respect to the areas on which the houses and structures are

constructed. The 10-house provision in article 3 of the 2005 easement deed permits the landowner to "construct, use and maintain within each of the ten (10) areas designated as a 'Building Area' * * * one (1) single family dwelling and other Structures customarily accessory to residential use". This permission to "construct, use and maintain" a dwelling constitutes an exception to some of the restrictions set forth in article 2 of the easement deed. For example, it is an exception to article 2.1, which in part prohibits the land in the conservation area from being "used as a residence", and is an exception to article 2.2, which prohibits the building of any structure on the conservation area. However, there are other restrictions in article 2, many of which remain in effect on the 10 building areas for the houses. Giving the owner the limited right to construct buildings on a portion of the conservation area is thus not the same thing as making that portion of the conservation area not subject to the easement. In my view, this right to construct buildings does not cause the 2005 and 2006 easements to fall outside the definition of a "qualified real property interest."

My view is consistent with our supplemental opinion in Belk II, at *9. This supplemental opinion explained the reasons we denied the Belk taxpayer's motion for reconsideration of the original Opinion in Belk I. In Belk I, the Court had held that an easement was not an interest in real property that was a perpetual

restriction on the use of the real property because different land could be

substituted for the land subject to the easement. Id., 140 T.C. at 10. In the motion

for reconsideration, the taxpayer in Belk claimed that this holding was inconsistent

with Priv. Ltr. Rul. 200403044 (Jan. 16, 2004) and Priv. Ltr. Rul. 9603018 (Jan.

19, 1996). Belk II, at *8-*9.

In Priv. Ltr. Rul. 200403044, the landowners had the right to construct

buildings on various building sites. The locations of the building sites were not

specified in the easement deed but had to be approved by the donee.[4] Thus, the

right to build on the building sites in Priv. Ltr. Rul. 200403044 is analogous to the

---

[4]In describing the provisions in the easement deed regarding the building sites, Priv. Ltr. Rul. 200403044 (Jan. 16, 2004) stated:

> Only a limited number of building sites are reserved, and the location of those sites is subject to the approval of the Donee. Thus, the present case is similar to example (4) above; even though Taxpayer and Donee have not agreed to the location of the building sites in advance, the Donee must approve any proposed location of a building site and, consistent with its power and obligation to enforce the terms of the Easement, must ensure that the location of any proposed building site is consistent with the wildlife habitat purposes of the Easement.

The reference in the private letter ruling to "example (4)" is to sec. 1.170A-14(f), Example (4), Income Tax Regs. In that example, an easement deed allowed the construction of four houses on each of five nine-acre clusters, for a total of 20 houses, "subject to site and building plan approval by the donee organization". The regulation stated that a deduction for the contribution of the easement would be allowable.

right to build on the 6 building areas in the 2006 Pine Mountain easement: The locations of the 6 building areas are not specified by the easement deed, but they must be approved by the donee.[5]

In the second private letter ruling cited by the taxpayer in Belk II, the landowner had the right to construct houses on certain "building envelopes". Priv. Ltr. Rul. 9603018. The locations of the building envelopes were specified in the easement deed but could be moved within the easement area with permission of the donee. Id. Thus, the right to build on the building envelopes in Priv. Ltr. Rul.

---

[5]Priv. Ltr. Rul. 9603018 (Jan. 19, 1996) described the right to construct the houses as follows:

Taxpayers reserve the right to construct one additional residence and associated improvements within Area C (which is identified on a map attached to the deed of easement as located near the edge of the Property but which taxpayers have represented is not visible from the road that borders the edge of the Property), additional associated improvements within Area A (which already contains a residence), and no more than five new residences and associated improvements within Limited Building Sites associated with specifically designated Building Envelopes. The residential construction permitted on these parcels does not require Donee approval, but may not interfere with the essential scenic quality of he Property or with the governmental conservation policies being furthered by the Easement.
The deed also reserves to taxpayers the right to relocate the Building Envelopes and to construct structures outside the specified areas, both of which actions require Donee approval. * * * [Fn. ref. omitted.]

9603018 is analogous to the right to build on the 10 building areas in the 2005 Pine Mountain easement:  The locations of the building envelopes are specified in the easement deed but may be changed with permission of the donee.

Here is what Belk II said about the house construction rights reserved in the two private letter rulings:

> Belk I is not in conflict with these private letter rulings.  Belk I does not speak to the ability of parties to modify the real property subject to the conservation easement; it simply requires that there be a specific piece of real property subject to the use restriction granted in perpetuity.

Belk II, at *9.  Exactly so.  The entire easement in Belk, and every one of its restrictions, could be lifted from one piece of land and float onto another.  This is different from an easement that waives some of its restrictions on building sites within the easement and thus allows the "parties to modify the real property subject to the easement".  Id.  Thus, the easement in Belk is different from the 2005 and 2006 Pine Mountain easements in this respect.

The IRS observes that we applied Belk in Bosque Canyon Ranch, L.P. v. Commissioner, T.C. Memo. 2015-130, at *12, vacated and remanded sub. nom. BC Ranch II, L.P. v. Commissioner, 867 F.3d 547 (5th Cir. 2017).  In Bosque Canyon Ranch L.P. v. Commissioner, at *12, we held that two conservation easements were not qualified real property interests under section 170(h)(2)(C)

because there could be modifications of the boundaries between the land governed by each easement and various "Homesite parcels". That case is distinguishable because those "Homesite parcels" were completely free of the easements. As our opinion in Bosque Canyon Ranch, L.P. v. Commissioner, at *11, stated, the "2005 and 2007 deeds permit modifications to the boundaries between the Homesite parcels and property subject to the easements", which accurately implies that the Homesite parcels are not "property subject to the easements." The U.S. Court of Appeals for the Fifth Circuit reversed our holding that each conservation easement was not a qualified real property interest. BC Ranch II, L.P. v. Commissioner, 867 F.3d at 554. Among the reasons given by the Court of Appeals were that (1) under each easement the "Homesite parcels" could be moved only within the boundaries of a larger defined land area and (2) under each easement any modifications to the boundaries of the "Homesite" parcels had to be approved by the donee, NALT. Id. at 553-554. The reasons are challenged by the opinion of the Court, but it is unnecessary to decide whether the reasoning of the Court of Appeals in Bosque Canyon Ranch is correct because, as stated above, that case is distinguishable. There is no point to explaining, as the opinion of the Court does, that (1) we are not bound to follow the Court of Appeals' opinion, (2) our opinion in Bosque

Canyon Ranch was rightly decided, and (3) we agree with the Court of Appeals'
dissenting opinion rather than the majority opinion.

The opinion of the Court argues that I erroneously distinguish the easements
in Bosque Canyon Ranch from the 2005 and 2006 Pine Mountain easements. See
op. Ct. note 6. To support this argument, the footnote expressly conflates the areas
referred to as "Homesite parcels" in the Bosque Canyon Ranch easements with the
"building areas" in the 2005 and 2006 Pine Mountain easements. The Bosque
Canyon Ranch easement deeds exempted from their restrictions the areas defined
in the Bosque Canyon Ranch opinion as "Homesite parcels". This is apparent
from the plain language of the easement deeds. There were two easements in
Bosque Canyon Ranch. The first easement was donated by Bosque Canyon
Ranch, L.P. The preamble to the first easement deed defined the "Property" as
1,878 acres described by metes and bounds in exhibit A to the easement deed.
Another portion of the preamble defined the "Conservation Area" and "Homestead
Parcels" as separate areas of land:

> WHEREAS, the Property includes, within its boundaries, land
> consisting of 1,750.01 acres, more or less (hereinafter the
> "Conservation Area"), being all of the Property less and except the 25
> parcels of land described by metes and bounds on Exhibit "B"
> (hereinafter called individually a "Homestead Parcel" or collectively
> the "Homestead Parcels") attached hereto and incorporated herein
> * * *.

Thus, by definition the land in the Conservation Area was different from the land in the Homestead parcels. Next, article 1 of the first Bosque Canyon Ranch easement deed provided that the landowner granted a "perpetual easement" over the "Conservation Area". Article 2 provided that the "Conservation Area" was subject to various restrictions. Article 3 reserved various rights to the landowner as exceptions to Article 2. Article 3.21 allowed the boundaries of the "Homestead Parcels" to be modified:

> 3.21. The boundaries of the Homestead Parcels may be modified by mutual agreement of the Trust [NALT] and the legal owner or owners of that portion of the Property which is the subject of the boundary line modification at the time of modification, subject to the following conditions:

> 3.21.1. The boundary line modification does not, in the Trust's reasonable judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes.

> 3.21.2. The area of each Homestead Parcel shall not be increased.

> 3.21.3. The modification shall be set forth in a written amendment to this Conservation Easement signed by duly authorized officers of the Trust and by the legal owner or owners of the portion of the Property which is the subject of the Homestead Parcel modification at the time of modification. The amendment shall be recorded in the same place of public record in which this Conservation Easement was recorded, and shall not be effective until so recording.

The deed for the second easement in Bosque Canyon Ranch (an easement granted by BC Ranch II, L.P.) has similar provisions. A stipulation in Bosque Canyon

Ranch refers to the Homestead Parcels in both easements as "Homesite parcels". The opinion in Bosque Canyon Ranch follows this convention.

But the 2005 and 2006 Pine Mountain easement deeds do not use the term "Homestead Parcels" (or Homesite parcels). Instead, they refer to "building areas"; and the easements have the effect of lifting some of the restrictions on these "building areas". Despite the partial lifting of restrictions, the "building areas" are still within the 2005 and 2006 easements. The "building areas" are therefore unlike the "Homesite parcels" in Bosque Canyon Ranch, which are outside the easement areas.

The difference between the "Homesite parcels" in Bosque Canyon Ranch and the "building areas" in the 2005 and 2006 Pine Mountain easements is a substantive distinction, not merely a difference in names. To obscure this distinction, note 6 of the opinion of the Court uses the term "Homesite parcels" (the defined term in Bosque Canyon Ranch) even to refer to the building areas in the 2005 and 2006 Pine Mountain easements. This misleading terminology distorts the facts of both this case and Bosque Canyon Ranch. "Homesite parcel" is a defined term used in the Bosque Canyon Ranch opinion to refer to particular pieces of land not governed by the easements. Bosque Canyon Ranch, L.P. v. Commissioner, at *11 ("The 2005 and 2007 deeds permit modifications to the

boundaries between the Homesite parcels and property subject to the easements.").

As paragraph 107 of the stipulation of facts in Bosque Canyon Ranch stated:

> During 2005, each limited partner in BCR I [Bosque Canyon Ranch, L.P.] made a capital contribution in the amount of $350,000.00 and received a partnership unit in BCR I.  As set forth in the Agreement of Limited Partnership for BCR I, each partnership unit entitled a limited partner to receive (i) a 5-acre homesite parcel ("Homesite Parcel") within the portion of Bosque Canyon Ranch owned by BCR I that was excluded from the property subject to the Deed of Easement * * *.  [Emphasis added.]

See also Bosque Canyon Ranch stipulation of facts, para. 209.

The right to construct houses in the building areas conferred by the 2005 and 2006 Pine Mountain easement deeds is therefore not analogous to the Homesite parcels in Bosque Canyon Ranch.  A better analogy is to the right found in article 3.1.3 of the Bosque Canyon Ranch easement deeds.  See Bosque Canyon Ranch, Ex. 135-J, at 6; Ex. 207-J, at 7.  Article 3.1.3 gave the landowner the right to construct "one or more recreational or meeting buildings, a swimming pool and a sports court provided that any such building, pool and court shall be located within an area of the Conservation Area approved by Trust [NALT] and do not exceed, in the aggregate, more than 20,000 square feet of ground coverage area".  Thus, article 3.1.3 reserved the right to build various structures anywhere in the

conservation area subject to the location's being approved by NALT.[6]  Did we

hold in <u>Bosque Canyon Ranch</u> that article 3.1.3 violated section 170(h)(2)(C)?

No.  We held that it was the provisions related to Homesite parcels that violated

section 170(h)(2)(C).  <u>Bosque Canyon Ranch, L.P. v. Commissioner</u>, at *12.  But

today the opinion of the Court interprets <u>Bosque Canyon Ranch</u> to mean that the

building-area provisions in the 2005 and 2006 Pine Mountain easement deeds

violate section 170(h)(2)(C) even though the <u>Bosque Canyon Ranch</u> opinion did

not say anything about article 3.1.3 of the <u>Bosque Canyon Ranch</u> easement deeds,

which is analogous to the building-area provisions in the 2005 and 2006 Pine

Mountain easement deeds.  Today's interpretation of <u>Bosque Canyon Ranch</u> is an

exercise in alternative history.  It is as if the Court thinks it can rewrite the holding

in <u>Bosque Canyon Ranch</u> to address rights like those reserved in article 3.1.3 of

the <u>Bosque Canyon Ranch</u> easement deeds.  The actual opinion in <u>Bosque Canyon

Ranch</u> is unchanged.  By its plain language it was concerned with the Homesite

parcels--areas of land unrestricted by the easements that could be swapped for

restricted land.  The <u>Bosque Canyon Ranch</u> opinion was not about the right in

_____

[6]Also, according to the <u>Bosque Canyon Ranch</u> easement deeds, none of the
reserved rights could be exercised in a way that would have an "adverse effect on
Conservation Purposes."  There is a similar provision in the Pine Mountain
easement deeds.

article 3.1.3 of the <u>Bosque Canyon Ranch</u> easement deeds. The <u>Bosque Canyon Ranch</u> case is not analogous to this case. The alternative history in the opinion of the Court does not make it so.

For the 2006 Pine Mountain easement, the opinion of the Court focuses exclusively on the building-area rights and concludes that these rights alone cause the easement to fail to qualify as an interest in real property that is a perpetual restriction on the use of the real property. But for the 2005 easement, the opinion of the Court mentions not just the building areas. It also mentions the right to build 10 barns, 2 scenic overlooks, a riding stable, an indoor riding ring, piers and boat launches, 5 ponds, and wildlife hunting stands. Thus, the opinion of the Court could be interpreted as holding that the land that would be affected by these rights is not restricted by the 2005 easement. If this is the holding of the opinion of the Court, the easements in <u>Bosque Canyon Ranch</u> remind us why the holding is wrong. The <u>Bosque Canyon Ranch</u> easement deeds reserve similar rights, but the <u>Bosque Canyon Ranch</u> Tax Court opinion does not hold that those rights violate the perpetual-use-restriction statutory test. For example, the easement deeds in <u>Bosque Canyon Ranch</u>, like the 2006 Pine Mountain easement deed, allowed the construction of barns: "Owner may construct and maintain the following: * * * one or more barns and run-in stalls or similar structures for equestrian use

provided that the same are located within an area of the Conservation Area approved by Trust and do not exceed, in the aggregate, more than 20,000 square feet of ground coverage area". The barns could be built anywhere on the land covered by the easements (if NALT approved the location). Did our opinion in Bosque Canyon Ranch say it was this right to build barns (which is found in article 3.1.2 of the Bosque Canyon Ranch easement deeds) that caused the easements to fail the perpetual-use-restriction test? No, we said the disqualifying reason was that the easements "permit modifications to the boundaries between the Homesite parcels and property subject to the easements." Bosque Canyon Ranch, L.P. v. Commissioner, at *11. And, like the 2006 Pine Mountain easement, the Bosque Canyon Ranch easement deeds allowed the construction of hunting stations: "Owner may construct and maintain the following: * * * shooting stations for skeet, trap, five stand, sporting clays of similar shooting sports and related buildings (not exceeding an aggregate of 3,000 square feet of ground coverage area for all such stations and related buildings); and underground utilities to serve the aforesaid facilities." The hunting stations could be built anywhere on the land governed by the easements. Did our opinion in Bosque Canyon Ranch hold that it was this right to construct hunting stations that caused the easements to fail to be perpetual restrictions on the use of the land? No. And, although the

easement deeds in <u>Bosque Canyon Ranch</u> did not reserve the right to construct scenic overlooks as the 2005 Pine Mountain easement deed did, they did allow the owner to construct and maintain "covered shelters or pavilions (not exceeding an aggregate of 5,000 square feet of ground coverage area for all shelters or pavilions)". Our opinion in <u>Bosque Canyon Ranch</u> did not hold that the right to build shelters (which is found in article 3.1.4 of the <u>Bosque Canyon Ranch</u> easement deeds) caused the easements to fail to be perpetual restrictions on the use of the land.

And then there is the right to create ponds. Article 3.7 of the <u>Bosque Canyon Ranch</u> easement deeds provided: "Owner may construct one or more new ponds for recreational use, not to exceed an aggregate surface area of 30 acres for all ponds and subject to reasonable location and design review and approval by Trust to determine that the ponds will have no material adverse affect on the Conservation Purposes." Our opinion in <u>Bosque Canyon Ranch</u> does not state that the right to create ponds is what caused the easements to fail the perpetual-use-restriction test. By contrast, the opinion of the Court points to the pond rights as an example of why the 2005 Pine Mountain easement fails the test. <u>See</u> op. Ct. p. 47.

It is as if the authors of the opinion of the Court think that the right to create a pond means that the land that would be covered by and displaced by the pond is unprotected by the conservation easement. Such a view is inconsistent with the text of the 2005 Pine Mountain easement deed, which gives NALT the power to determine the location and design of the ponds. Thus, the right to create ponds is itself restricted by the easement deed. The implicit view that pond land is unprotected by the easement is also inconsistent with the record in this case. A biologist employed by NALT credibly testified that NALT would allow a pond to be created only if the design of the pond protected natural habitats--for example, if there was an adequate "littoral shelf" (a submerged shelf of land near the edge of the pond with aquatic vegetation). In my view, therefore, even the land on which ponds can be created is subject to a perpetual-use restriction of the 2005 easement.

Desperate to pull this case into the domain of our Bosque Canyon Ranch opinion, the opinion of the Court says that our Bosque Canyon Ranch opinion held that the reserved rights in Bosque Canyon Ranch--not the provisions regarding the Homesite parcels--caused the Bosque Canyon Ranch easements to fail the perpetual-use-restriction test. It points to the following statement: "In addition, BCR I retained various rights relating to the property, including rights to raise livestock; hunt; fish; trap; cut down trees; and construct buildings, recreational

facilities, skeet shooting stations, deer hunting stands, wildlife viewing towers, fence, ponds, roads, trails, and wells." Bosque Canyon Ranch, L.P. v. Commissioner, at *5. The opinion of the Court claims that the recitation of these rights in the findings of fact of our opinion in Bosque Canyon Ranch means that our holding in Bosque Canyon Ranch hinged on those rights. Quoting that statement, the opinion of the Court opines: "Although the easements barred [in Bosque Canyon Ranch] residential or commercial development within the conserved area, the developer retained numerous rights resembling those reserved by Pine Mountain." See op. Ct. p. 37. But the holding in Bosque Canyon Ranch hinged on the right to change the boundaries of the Homesite parcels. Bosque Canyon Ranch, L.P. v. Commissioner, at *12. The Court of Appeals in Bosque Canyon Ranch also understood the Tax Court's holding in that case to hinge on the movability of the Homesite parcel boundaries. The Court of Appeals majority opinion contains this sentence: "The court [the Tax Court] held that because the homesite parcel boundaries could be changed to include property within the original easement, the easement was not granted in perpetuity." BC Ranch II, L.P. v. Commissioner, 867 F.3d at 552. The Court of Appeal's dissenting opinion is also consistent with the proposition that our holding in Bosque Canyon Ranch related to the changeability of the boundaries between the Homesite parcels and

the land encumbered by the easement. The Court of Appeals dissent explained that because the easements in Bosque Canyon Ranch allowed modifications of the Homesite parcel boundaries, the "Tax Court was correct". Id. at 561-562 (Dennis, J., dissenting).

The attempt by the Court to reinterpret our holding in Bosque Canyon Ranch is unconvincing. Our opinion in Bosque Canyon Ranch plainly stated that the right to change the boundaries of the Homesite parcels caused the easements to fail the perpetual-use-restriction test. Bosque Canyon Ranch is therefore not relevant to the 2005 and 2006 Pine Mountain easements because the building areas defined in the easement deeds are governed by the restrictions in the deeds.

At times it almost seems as if the opinion of the Court recognizes the incorrectness of its theory that the building areas are outside the 2005 and 2006 Pine Mountain easements. This may explain why it pushes the view that even if the building areas are affected by the restrictions of the easement, these restrictions are not sufficiently effective to be considered restrictions at all. See op. Ct. pp. 50-51. In particular, the opinion of the Court asserts that each of the 2005 and 2006 easements "permit[s] uses antithetical to its conservation purposes" through the building-area provisions. See op. Ct. p. 49. Similarly, it says that the prohibition on industrial uses, even though binding on the land in the building

areas, does not matter because industrial uses are prohibited by a municipal zoning ordinance anyway. See id. p. 50. But the relative weakness of the easement deeds' restrictions on the building areas is relevant only to whether the easements protect conservation purposes in perpetuity under section 170(h)(5)(A). Indeed, as I explain below, I would hold that the 2006 easement does not protect the stated conservation purposes in perpetuity under section 170(h)(5)(A), primarily because of the partial lifting of restrictions on the 6 building areas in the 2006 easement deed. But the opinion of the Court does not reach this section 170(h)(5)(A) issue. Instead it holds that the existence of the building-area provisions in the 2005 and 2006 easement deeds disqualify those easements under section 170(h)(2)(C), the perpetual-use-restriction test. This is a different test from section 170(h)(5)(A). Belk I, 140 T.C. at 12 ("[T]he section 170(h)(5) requirement that the conservation purpose be protected in perpetuity is separate and distinct from the section 170(h)(2)(C) requirement that there be real property subject to a use restriction in perpetuity."). Under section 170(h)(2)(C), the easement must be an "interest[] in real property" that is "a restriction (granted in perpetuity) on the use which may be made of the real property." We held in Belk that section 170(h)(2)(C) requires that the restriction burden a particular piece of property. See Belk II, at *6-*8 (explaining Belk I); see also Belk III, 774 F.3d at 225 ("The placement of the

article 'the' before 'real property' makes clear that a perpetual use restriction must attach to a defined parcel of real property rather than simply some or any (or interchangeable parcels of) real property."). Here the 2005 and 2006 easements burden particular pieces of land, i.e., they burden the whole "conservation area[s]" covered by the easements. It does not matter for section 170(h)(2)(C) purposes that some of the restrictions do not reach the building areas within these conservation areas. The building areas are still governed by other restrictions, and the building areas are still part of the conservation areas. And it does not matter, contrary to the opinion of the Court, that some of the remaining restrictions are redundant with zoning restrictions. Even the redundant restrictions in the easements are perpetual restrictions on the use of the building areas. The zoning restrictions may change.

Another instance in which the opinion of the Court seems to recognize the falseness of its theory that the building areas are outside the easements is its handling of the fact that the Pine Mountain easements impose multiple restrictions on the conservation areas. The 2005 easement and the 2006 easement each impose 18 restrictions. As explained above, only some of the restrictions are lifted for the land in the building areas. The opinion of the Court avoids this reality by pretending that the 2005 and 2006 easements contain only the one restriction--the

restriction on residential, commercial, and industrial development found in article 2.1 of each easement deed. "To that end [preservation of the conservation area], article 2 of the easement prohibits residential, commercial, and industrial development of the 2005 Conservation Area while permitting recreational and agricultural activity (including breeding livestock and growing crops)." See op. Ct. p. 13. The article 2.1 restriction is indeed partially lifted as to the land in the building areas should the landowner exercise its reserved right to build houses in the building areas. But the article 2.1 restriction is only partially lifted in the building areas. If the landowner builds houses in the building areas, the landowner is prevented by article 2.1 from replacing the houses with commercial or industrial buildings. And there are restrictions other than article 2.1 that continue to apply to the building areas, such as the prohibition on dumping trash on the land. By pretending there is only one restriction in the 2005 and 2006 easements, the opinion of the Court never comes to grips with the fact that there are multiple restrictions in the easements and that the building areas are subject to some of those restrictions.

The IRS and the opinion of the Court also observe that we applied Belk I in Balsam Mountain Invs., LLC v. Commissioner, T.C. Memo. 2015-43, at *7-*8. Like Belk, Balsam Mountain is distinguishable. Areas of land could be

completely removed from all of the restrictions of the <u>Balsam Mountain</u>

easement.[7]

In conclusion, each of the 2005 and 2006 easements is a "qualified real

property interest" despite what the opinion of the Court says.  In summary, there

are nine errors in its conclusion that the right to construct houses and other rights

in the 2005 and 2006 easement deeds cause the easements to fail the granted-in-

perpetuity requirement of section 170(h)(2)(C).

First, the opinion of the Court is inconsistent with our Opinion in <u>Belk I</u>,

140 T.C. at 3, 10, where we held that the easement was not described by section

170(h)(2)(C) because the easement deed permitted the landowner to "substitute"

contiguous land for "land comprising a portion of the Conservation Area."  By

---

[7]The opinion of the Court misapprehends our reasoning in <u>Balsam Mountain Invs., LLC v. Commissioner</u>, T.C. Memo. 2015-43.  The easement in <u>Balsam Mountain</u> allowed the landowner to substitute unencumbered land for up to 5% of the encumbered land by changing the boundary of the encumbered land.  <u>Id.</u> at *3-*4.  The encumbered land was referred to in the easement deed as the "Conservation Area."  <u>Id.</u> at *3.  We held in <u>Balsam Mountain</u> that the easement failed sec. 170(h)(2)(C) because it allowed the landowner to "change the boundaries of the 'Conservation Area' burdened by the easement."  <u>Id.</u> at *8-*9.  We did not say in <u>Balsam Mountain</u>, as the opinion of the Court says we said, that the easement failed because the "taxpayer retained the right to develop up to 5% of that property."  <u>See</u> op. Ct. p. 36.  The landowner could develop 5% of the property in the "Conservation Area" only because the landowner could shift the entire easement, with all its restrictions, away from 5% portion of the "Conservation Area".  It was the landowner's ability to shift the easement boundary that disqualified the easement.

contrast, there is no such land-substitution clause in the 2005 and 2006 Pine Mountain easement deeds.

Second, the opinion of the Court contradicts our supplemental, unpublished, opinion in Belk II, at *8-*9, where we held that Belk I did not deal with the right to construct buildings.  Such a right, we held, was "the ability of the parties to modify the real property subject to the easement" as opposed to a shift in the boundary of the easement.  See Belk II, at *9.

Third, the opinion of the Court contradicts the text of the easement deeds in Bosque Canyon Ranch stating that the "Homesite" parcels are outside the scope of the easements.  Contrary to this text, the opinion of the Court equates the building areas in the 2005 and 2006 easements with the "Homesite" parcels in Bosque Canyon Ranch.

Fourth, the opinion of the Court contradicts our unpublished opinion in Bosque Canyon Ranch where we distinguished between the "Homesite parcels" and the "property subject to the easements".  Bosque Canyon Ranch, L.P. v. Commissioner, at *11.  The opinion of the Court states that the "Homesite parcels" are like the Pine Mountain building areas, which are inside the 2005 and 2006 easements.  This places the opinion of the Court in flat contradiction to the Bosque Canyon Ranch opinion's description of the "Homesite parcels".

Fifth, the opinion of the Court contradicts the stipulations in Bosque Canyon Ranch stating that the "Homesite parcels" are "excluded from the property subject to the Deed of Easement". The opinion of the Court states that the "Homesite parcels" are like the Pine Mountain building areas, which are property subject to the 2005 and 2006 easements, thus contradicting the stipulations of the parties in Bosque Canyon Ranch.

Sixth, the Court's reliance on Bosque Canyon Ranch for the proposition that the building rights cause the 2005 and 2006 Pine Mountain easements to fail the granted-in-perpetuity requirement cannot be squared with the treatment of analogous building rights in our Bosque Canyon Ranch opinion. In that opinion we recited that article 3.1.3 of the easement deeds in Bosque Canyon Ranch contained the right to construct "recreational or meeting buildings", but we did not state that these rights were the reason the easements failed the granted-in-perpetuity test. (Similarly, other provisions in the Bosque Canyon Ranch easement deeds allow barns and hunting blinds to be constructed within the areas protected by those easements, in unfixed locations, thus making those rights analogous to the building areas in the 2005 and 2006 Pine Mountain easements, but the Bosque Canyon Ranch opinion does not explain that those rights disqualified the deductions under the granted-in-perpetuity requirement.)

Seventh, the opinion of the Court explains why the Court of Appeals opinion in <u>Bosque Canyon Ranch</u> is wrong even though such an explanation is gratuitous. <u>See</u> op. Ct. pp. 41-43. The Court of Appeals' holding concerned the "Homesite parcels". The "Homesite parcels" in <u>Bosque Canyon Ranch</u> are unlike the building areas in the 2005 and 2006 Pine Mountain easements. The "Homesite parcels" are like holes in the easements. The building areas in the 2005 and 2006 Pine Mountain easements are not like holes in the easements; they are within the easements. Therefore, the Court's rebuttal of the Court of Appeals is unnecessary.

Eighth, the Court's treatment of the pond-creation rights in the 2005 easement deed is incorrect because restrictions in the easement continue to protect the areas even after the ponds are built and because the opinion of the Court's view incorporates the incorrect assumption that creating man-made ponds is destructive of conservation values.

Ninth, the opinion of the Court is inconsistent with section 1.170A-14(f), <u>Example</u> (<u>4</u>), Income Tax Regs. Example 4 describes an easement that reserves the right to build 24 houses on certain "sites". The example suggests that the "sites" are not entirely fixed by the terms of the easement. First, the example says that the donee has "site * * * approval". A site that must be approved is not fixed. Second, the example describes the "sites" as having been "identified" by the

"donor and the donee". This sounds different from the sites' being fixed in the easement. The building areas in the 2005 and 2006 Pine Mountain easements are also not entirely fixed by the easement deeds. The regulation supports the conclusion that the floating nature of the building rights does not cause the easements to fail the "granted in perpetuity" test of section 170(h)(2)(C).

II.  <u>The 2005 and 2007 easements protect conservation purposes in perpetuity; the 2006 easement does not</u>.

As explained above, the third requirement for a contribution to be a qualified conservation contribution is that the contribution be exclusively for conservation purposes. Sec. 170(h)(1)(C). Section 170(h)(4)(A) defines a "conservation purpose" as any the following objectives:

- the preservation of land areas for
  - outdoor recreation by the general public or
  - the education of the general public,

- the protection of
  - a relatively natural habitat of fish, wildlife, or plants or
  - similar ecosystem,

- the preservation of open space, including farmland and forest land, where such preservation
  - will yield a significant public benefit
  - and is
    - for the scenic enjoyment of the general public or
    - pursuant to a clearly delineated federal, state or local governmental conservation policy, or

- the preservation of
  - an historically important land area or
  - a certified historic structure.

The Code provisions that give the definitions of the four conservation purposes described above are clauses (i), (ii), (iii), and (iv), respectively.

In a further supplement to the third requirement for a contribution to be a qualified conservation contribution--that the contribution be exclusively for conservation purposes--section 170(h)(5)(A) provides: "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." A regulation interpreting section 170(h)(5)(A) provides that the contributed property interest must permit the underlying real property to be used only in a way consistent with the conservation purposes of the contribution:

> In the case of any donation under this section [i.e., section 1.170A-14, Income Tax Regs., which governs qualified conservation contributions], any interest in the property retained by the donor (and the donor's successors in interest) must be subject to legally enforceable restrictions (for example, by recordation in the land records of the jurisdiction in which the property is located) that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation. * * *

Sec. 1.170A-14(g)(1), Income Tax Regs. (emphasis added); see Mitchell v. Commissioner, 138 T.C. 324, 329 (2012) (section 1.170A-14(g)(1), Income Tax

Regs., relates to section 170(h)(5)(A)), supplemented by T.C. Memo. 2013-204,

aff'd, 775 F.3d 1243 (10th Cir. 2015); see also Glass v. Commissioner, 124 T.C.

258, 276-277 (2005) (suggesting that section 1.170A-14(g)(1), Income Tax Regs.,

may also be used to interpret section 170(h)(2)(C)), aff'd, 471 F.3d 698 (6th Cir.

2006).

Section 1.170A-14(f), Income Tax Regs., gives several examples to

illustrate the rule that the uses of land permitted by the easement must be

consistent with the conservation purposes of an easement. In Example 3, an

easement allows the construction of 10 single-family houses that would destroy

the scenic value of the land:

> Example (3). H owns Greenacre, a 900-acre parcel of woodland, rolling pasture, and orchards on the crest of a mountain. All of Greenacre is clearly visible from a nearby national park. Because of the strict enforcement of an applicable zoning plan, the highest and best use of Greenacre is as a subdivision of 40-acre tracts. H wishes to donate a scenic easement on Greenacre to a qualifying conservation organization, but H would like to reserve the right to subdivide Greenacre into 90-acre parcels with no more than one single-family home allowable on each parcel. Random building on the property, even as little as one home for each 90 acres, would destroy the scenic character of the view. Accordingly, no deduction would be allowable under this section.

Sec. 1.170A-14(f), <u>Example</u> (<u>3</u>), Income Tax Regs. In Example 4, an easement would allow construction of 20 single-family houses on a secluded portion of the land that would not impair the scenic view of the rest of the land:

> <u>Example</u> (<u>4</u>). Assume the same facts as in <u>example (3)</u>, except that not all of Greenacre is visible from the park and the deed of easement allows for limited cluster development of no more than five nine-acre clusters (with four houses on each cluster) located in areas generally not visible from the national park and subject to site and building plan approval by the donee organization in order to preserve the scenic view from the park. The donor and the donee have already identified sites where limited cluster development would not be visible from the park or would not impair the view. Owners of homes in the clusters will not have any rights with respect to the surrounding Greenacre property that are not also available to the general public. Accordingly, the donation qualifies for a deduction under this section.

<u>Id.</u> <u>Example</u> (<u>4</u>).

The IRS argues that the Pine Mountain easements do not protect conservation purposes in perpetuity because the easement deeds permit the property to be used in ways inconsistent with the conservation purposes of the easements. The three easement deeds (2005, 2006, and 2007) define their conservation purposes as (1) preservation of the conservation area as a relatively natural habitat of fish, wildlife, plants, or similar ecosystem and (2) preservation of the conservation area as open space which provides scenic enjoyment to the general public and yields a significant public benefit. In addition, the 2006

easement deed defines a third conservation purpose not found in the 2005 and 2007 easement deeds, i.e., preservation of the conservation area as open space which, if preserved, will advance a clearly delineated federal, state, or local governmental conservation policy and will yield a significant public benefit. The conservation purposes defined in the easement deeds match the statutory definitions of conservation purposes found in section 170(h)(4)(A)(i), (ii) and (iii), and the IRS does not dispute that the conservation purposes defined by the easement deeds meet the statutory definition of conservation purposes. The question the IRS raises is whether the rights reserved to the landowner permit "uses" that are "inconsistent with the conservation purposes of the donation." This argument refers to section 1.170A-14(g)(1), Income Tax Regs., which requires the easement to prevent uses of the land inconsistent with the conservation purposes of the donation.

There is a procedural issue to first consider. Eddleman Properties contends that the stipulation of facts bars the IRS from making the inconsistent-use argument. Paragraph 71 of the stipulation of facts, upon which Eddleman Properties relies in this regard, contains a sentence to the effect that the lands restricted by each respective easement contain a relatively natural habitat of fish, wildlife, plants, or similar ecosystems. By its terms, this sentence bars the IRS

from contending that there is no relatively natural habitat on the restricted land. Cf. Atkinson v. Commissioner, T.C. Memo. 2015-236, at *51 (where the IRS successfully argued that the land restricted by the easement was not a relatively natural habitat, the Court did not reach the question of whether the uses of the land permitted by the easement were inconsistent with preserving a relatively natural habitat). However, the next sentence in paragraph 71 states that the IRS takes the position that the reserved rights in the easements permit the destruction of the habitat. ("Respondent contends that the reserved rights contained in the respective conservation easement deeds permit the destruction of such habitats.") Paragraph 72, on which Eddleman Properties also relies, contains a sentence to the effect that the lands restricted by each respective easement provide open space for the scenic enjoyment of the general public and pursuant to a clearly delineated federal, state or local governmental policy. However, the next sentence in paragraph 72 states that the IRS takes the position that the reserved rights in the easement permit the impairment of the open space. ("Respondent contends that the reserved rights contained in the respective conservation easement deeds permit the impairment of such open space.") The IRS did not waive its argument, which is based on section 170(h)(1)(C) and (5)(A) and section 1.170A-14(g)(1), Income Tax Regs., that the

uses reserved to the owners in the easements are inconsistent with their conservation purposes. The merits of the argument should therefore be addressed.

Each easement deed, ostensibly to protect the conservation purposes defined in each easement deed, contains restrictions on the owner's use of the underlying property (restrictions which are found in article 2). Each easement deed has exceptions to these restrictions, which reserve certain rights to the owner to use the property (exceptions found in article 3). The IRS barely specifies in its briefs which of these reserved rights it thinks are inconsistent with the conservation purposes. It says vaguely: "The easements in this case contain several instances of inconsistent uses". It gives only one example of an inconsistent reserved right: the right of the landowner to construct certain signs (a right specified by each of the three easements). In its proposed findings of fact, however, the IRS gives a fuller description of the various uses of the land permitted by the reserved-right provisions in the easement deeds. Eddleman Properties did not object to this description in its answering brief. Set forth below are the various reserved-right provisions as described by the IRS in its proposed findings of fact:

| 2005 easement | 2006 easement | 2007 easement |
|---|---|---|
| Residential dwellings, accessory structures, barns, piers, and boat launches may be constructed on, or near, 10 "building areas". | Residential use may occur within 6 "building areas". | |
| A barn may be constructed within 1,000 feet of each building area. | A barn may be constructed within 1,000 feet of each building area. | |
| Two scenic overlooks may be established, one of which shall be similar to a picnic pavilion or gazebo, and the other of which "may include a guest bedroom". | | |
| Ten piers, three boat launches, and three boat storage buildings may be established near the building areas. | | |
| PMP [i.e., Pine Mountain] may build roads and driveways for access to the building areas and other permitted structures. | PMP may build roads and driveways for access to the building areas and other permitted structures. | |
| PMP may install service vehicle trails. | PMP may install service vehicle trails. | PMP may install service vehicle trails. |
| Five ponds may be constructed. | | |
| Fences and gates may be constructed. | Fences and gates may be constructed. | Fences and gates may be constructed. |
| PMP may construct wildlife stands, nests, and blinds. | PMP may construct wildlife stands, nests, and blinds. | PMP may construct wildlife stands, nests, and blinds. |
| PMP may breed and release game animals. | PMP may breed and release game animals. | PMP may breed and release game animals. |

| 2005 easement | 2006 easement | 2007 easement |
|---|---|---|
| PMP may restore streams and wetlands. | PMP may restore streams and wetlands. | PMP may restore streams and wetlands. |
| PMP may construct trails and paths. | PMP may construct trails and paths. | PMP may construct trails and paths. |
| PMP may construct raised walkways. | PMP may construct raised walkways. | PMP may construct raised walkways. |
| PMP may construct drainage control structures. | PMP may construct drainage control structures. | PMP may construct drainage control structures. |
| PMP may install utility facilities. | PMP may install utility facilities. | PMP may install utility facilities. |
| PMP may drill wells for residential service or another permitted use. | PMP may drill wells for permitted uses. | |
| PMP may use the conservation area for waste water disposal. | PMP may use the conservation area for waste water disposal. | |
| Hunting is permitted. | Hunting is permitted. | Hunting is permitted. |
| Forest management is permitted. | Forest management is permitted. | Forest management is permitted. |
| Tree cutting and removal is permitted. | Tree cutting and removal is permitted. | Tree cutting and removal is permitted. |
| Some signs are permitted. | Some signs are permitted. | Some signs are permitted. |
| PMP may maintain structures, roads, trails, and walkways. | PMP may maintain structures, roads, trails, and walkways. | PMP may maintain structures, roads, trails, and walkways. |
| Subdivision is permissible. | | |
| PMP shall notify NALT of intent to exercise reserved rights. | PMP shall notify NALT of intent to exercise reserved rights. | PMP shall notify NALT of intent to exercise reserved rights. |
| | A water tower may be built. | A water tower may be built. |

Most of the reserved-right provisions are subject to conditions not apparent from the summary in the table. Many of the rights can be exercised only with the approval of NALT. Additionally, many of the rights can be exercised only if to do so would not undermine the avowed conservation purpose. After considering the text of all three easements, including the provisions described in the table above and after considering the other evidence in the record, I conclude:

- The 2005 easement does <u>not</u> permit uses inconsistent with its conservation purposes.

- The 2006 easement <u>does</u> permit uses inconsistent with its conservation purposes.

- The 2007 easement does <u>not</u> permit uses inconsistent with its conservation purposes.

The reasons for the above conclusions follow.

I initially observe that one should not expect an easement protecting a natural habitat or scenic beauty to completely prohibit the use of land by humans. Easements can reserve the right of landowners to construct buildings and to use the land for various other purposes and still be considered contributions exclusively for conservation purposes. See <u>Glass v. Commissioner</u>, 124 T.C. at 269, 271, 283 (conservation easement permitted construction of overlook decks,

patios, boat houses); Butler v. Commissioner, T.C. Memo. 2012-72, 103 T.C.M. (CCH) 1359, 1362, 1365 (conservation easement on 393.33 acres of land reserved the right to partition property into 11 smaller tracts averaging 36 acres, each of which would include a 2-acre building site on which a home and a garage could be constructed); sec. 1.170A-14(f), Example (4), Income Tax Regs. (donation of an easement on 900 acres was deductible where easement permitted landowner to build four houses on each of five 9-acre clusters, the sites must be approved by the entity to which the easement was donated, and the donor and the donee have already identified sites where development would not impair scenic view). Certain reserved rights, however, can subvert the conservation purposes. See Turner v. Commissioner, 126 T.C. 299, 313-314 (2006) (right to construct 62 houses on 15 acres with no limitations on the building areas). In my view, the most significant right reserved in the 2005 easement is the ability of the landowner to build 10 houses (referred to as "single family dwellings" in the easement deed). Each house can be built only on a designated building area, the size and location of which are, at least initially, set forth by the easement deed. (As explained supra part I, article 3.16 allows the boundaries of the building areas to be changed by

mutual agreement, subject to three conditions.[8]) The building areas are clustered together along the shore of a small man-made lake. At trial, Eddleman Properties elicited the testimony of a biologist employed by NALT. The biologist explained that NALT had made a complete inventory of plant and animal life on the property. He convincingly explained that the lake and the 10 building areas around the lake were of limited value as a natural habitat. The lake was man-made. The land around the lake had been disturbed by human use and was populated by new-growth trees. Therefore the biologist opined that the construction of 10 houses would not affect the conservation value of the easement. The IRS did not directly rebut this testimony. I would find that the right to construct the 10 houses does not permit a use that is inconsistent with protecting a relatively natural habitat. Furthermore, I would find that the relatively dense clustering of the 10 houses on the 10 acres of the building areas would not appreciably affect the scenic value of the 559 acres of land governed by the easement. I therefore conclude that the reserved right to build the 10 houses is not inconsistent with either of the conservation purposes of the 2005 easement, i.e., preserving a relatively natural habitat and preserving scenic open space. Moving

---

[8]One condition is that the building areas can be changed only if in NALT's reasonable judgment it would not undermine the easement's conservation purpose.

from the specific to the general, I would find that none of the rights reserved to the owner by the 2005 easement permit uses that are inconsistent with either of the conservation purposes of the 2005 easement, i.e., preserving a relatively natural habitat and preserving scenic open space. As the NALT biologist convincingly testified, none of the rights impairs relatively natural habitats. Furthermore, based on the record as a whole, I would find that none of the reserved rights appreciably affects the scenic value of the land governed by the 2005 easement. Therefore, Pine Mountain should get a deduction for the donation of the 2005 easement. See sec. 1.170A-14(f), Example (4), Income Tax Regs.

In considering the 2006 easement, it is useful to clarify what conservation purposes it ostensibly serves. The easement purportedly serves three conservation purposes: (1) preservation of a relatively natural habitat or ecosystem, (2) preservation of open space that provides scenic enjoyment to the general public and yields a significant public benefit, and (3) preservation of open space, pursuant to a clearly delineated federal, state, or local governmental policy, that yields a significant public benefit. Both the second and third purposes concern the preservation of open space. A determination of whether the easement protects the second conservation purpose is relatively straightforward. Eddleman Properties alleges that the easement protects ridgelines that provide scenic vistas. Thus, the

question to be answered is whether the reserved rights are consistent with protecting these scenic vistas. A determination of whether the easement protects the third purpose, preserving open space pursuant to a clearly delineated federal, state, or local governmental policy, is less straightforward. Eddleman Properties on brief does not identify which governmental policy is advanced by the easement's preservation of open space. Although the parties have agreed, in paragraph 72 of the stipulation, that the property "over which" the 2006 easement "was granted" provides "open space" by "preserving open space * * * pursuant to a clearly delineated federal, state or local governmental policy", the paragraph does not identify the policy to which it refers. The same paragraph refers to, and therefore preserves, the IRS's argument that the 2006 easement permits "the impairment of such open space". To defeat this argument, Eddleman Properties needed to, but did not, identify the governmental policy advanced by the easement. Without the specific policy's being identified, it is difficult for the Court to evaluate whether the uses permitted by the easement deed are consistent with that policy. I consider Eddleman Properties to have waived any argument that the 2006 easement protects the preservation of open space pursuant to a governmental policy. See Atkinson v. Commissioner, at *52 (holding that the taxpayer abandoned a similar argument by failing to specify the particular governmental

policy). It is necessary to consider only whether the 2006 easement protects the first and second conservation purposes identified in the easement deed (preserving a relatively natural habitat and preserving open space for the scenic enjoyment of the general public that yields a significant public benefit). The most significant right reserved by the 2006 easement deed to the owner of the land is the right to build a house in each of 6 building areas. I would find that this use is inconsistent with the two conservation purposes. The 2006 easement deed does not identify the locations of the 6 building areas on the 499 acres of land governed by the 2006 easement. The size of each building area is unspecified in the easement deed, although it cannot exceed one acre. The location of each building area must be approved by NALT and can be approved only if in NALT's judgment the building area does not directly or indirectly result in any material adverse effect on any of the conservation purposes of the easement or the features of the conservation area having ecological or scenic significance. Thus, NALT has veto power over the location of the 6 building areas. Using this veto power, Eddleman Properties argues, NALT would prevent the construction of houses in locations that would adversely affect conservation purposes. I would find, however, that the right to build 6 houses is inconsistent with the conservation purposes of preserving a relatively natural habitat and protecting open space for the scenic enjoyment of the

general public. I do not know where the building areas for the 6 houses will be. For the 2005 easement, there was testimony by an NALT biologist that the initial locations, at least, of the building areas would not undermine the conservation purposes of the easement. This testimony was corroborated by other evidence in the record, such as maps and photographs. That the locations of the building areas were identified in the 2005 easement deed allowed the IRS the opportunity to present evidence that the specific building areas were inconsistent with the conservation purposes. There was no such opportunity regarding the 2006 easement. There is only a vague hope that NALT will exercise its veto over boundary areas that would undermine the conservation purposes. This hope is not enough to convince me that the right to build in these yet-to-be-specified building areas is consistent with the conservation purposes. I conclude that the reserved right is inconsistent with the conservation purposes.

As explained above, my view that the building rights reserved in the 2005 easement deed are consistent with conservation purposes, but that the building rights reserved in the 2006 easement deed are not, is in part attributable to the differences in various terms of the two easement deeds with respect to building rights. These terms are summarized below:

|  | 2005 | 2006 |
|---|---|---|
| Total conservation area | 559 Acres | 499 Acres |
| Number of building areas | 10 | 6 |
| Location of building areas | •Specified in easement<br>•Can change by amendment approved by NALT | •To be specified later<br>•Must be approved by NALT |
| Size of building areas | Size of each building area is specified.  The sum of the acreages of all 10 building areas is 10 acres. | •Unspecified<br>•Up to 1 acre each |
| $\dfrac{\text{Total conservation area}}{\text{Number of building areas}}$ | $\dfrac{559}{10} = 56$ acres | $\dfrac{499}{6} = 83$ acres |

As the table illustrates, the sizes and locations of the building areas were specified in the 2005 easement deed.  The building areas in the 2006 easement deed were not specified.  One can argue that the ability to place the boundary areas in the 2005 easement is similar to the ability to place the boundary areas in the 2006 easement.  The 2006 easement deed allows building areas to be initially placed only with the approval of NALT.  The 2005 easement allows the initial location of the building areas to change, subject to NALT's approval.  Thus, with both easements, NALT's approval controls the location of the building areas.  Despite this similarity between the two easements, the 2005 easement deed's specification

of the exact location and size of the building areas, together with elements of the record, convinces me that the right to build on these building areas does not undermine conservation purposes. The lack of specification in the 2006 easement deed as to the location of the building areas, along with other evidence in the record, leads me to conclude that the use of these building areas would undermine conservation purposes.

Now consider the 2007 easement. Unlike the 2005 and 2006 easement deeds, the 2007 easement deed does not contain a reserved-right provision allowing the landowner to construct houses. This is the most significant right found in the 2005 and 2006 easement deeds, a right that caused me to conclude that the 2006 easement deed allowed uses of the land that were inconsistent with its conservation purposes. Although the 2007 easement deed allows the landowner to use the land in various other ways, I would find that, on the basis of the record, these uses are consistent with the conservation purposes of the easement. Therefore, Pine Mountain should get a deduction for the donation of the 2007 easement.

III.    The fair market value of the 2005 easement is $27,904,500.

The opinion of the Court holds that no deduction is available for the 2005 easement because, in its view, the easement fails the granted-in-perpetuity

requirement.  In my view, a deduction is permitted.  I would hold that its value is $27,904,500.  The explanation for this value is given in T.C. Memo. 2018-214, issued today.